# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 27, 2001 Session

## STATE OF TENNESSEE v. CHESTER LEE JENKINS

**Direct Appeal from the Circuit Court for Blount County**
**Nos. C-12430, 31    D. Kelly Thomas, Jr., Judge**

---

**No. E2001-01173-CCA-R9-CD**
**March 8, 2002**

---

This is a Rule 9, Tennessee Rules of Appellate Procedure, interlocutory appeal of the trial court's order sustaining in part and denying in part the defendant's motion to suppress his statement to police. The defendant, who is totally deaf, is charged with first degree murder and aggravated arson. On the morning after the residential fire that claimed the victim's life, a deputy sheriff entered the defendant's home, tapped him on the shoulder to awaken him, and asked, via gestures and a written note, that the defendant accompany him to the sheriff's department for questioning. Investigators at the department interviewed the defendant and took his statement through an interpreter of American Sign Language. The defendant argued that the statement should be suppressed on two grounds: (1) that it was the fruit of an unlawful seizure, in violation of his Fourth Amendment right to be free from unreasonable search and seizure; and (2) that it was taken without adequate <u>Miranda</u> warnings, in violation of his Fifth Amendment right to counsel. Finding that the defendant voluntarily accompanied the deputy to the sheriff's department, but that he was in custody at the department and that the State failed to prove that he had been given an adequate <u>Miranda</u> warning, the trial court denied the motion to suppress on Fourth Amendment grounds, but granted it on Fifth Amendment grounds. The State appeals that portion of the trial court's order sustaining the motion on Fifth Amendment grounds, and the defendant appeals that portion of the order denying the motion on Fourth Amendment grounds. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Raymond Mack Garner, District Public Defender; George H. Waters, Assistant District Public Defender; and Stacey D. Nordquist, Assistant District Public Defender, for the appellant/appellee, Chester Lee Jenkins.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Michael L. Flynn, District Attorney General; Kirk E. Andrews, Assistant District Attorney General;

and Edward P. Bailey, Jr., Assistant District Attorney General, for the appellee/appellant, State of Tennessee.

## OPINION

## FACTS

On November 20, 1999, the victim, Joe Marshall, who was hearing-impaired, died in a fire that was deliberately set at his house trailer on Old Knoxville Highway in the Rockford Community of Blount County. When Blount County Sheriff's Department investigators arrived to begin their investigation, they found a small crowd of people, including several hearing-impaired men, assembled at the scene. Captain James Long, at the time a detective-sergeant and the chief investigator in the case, testified at the preliminary and suppression hearings that he was able to partially communicate with these men by talking slowly, and by use of a "makeshift" interpreter, a friend of the men who knew some sign language. By these means, Captain Long learned that the victim had spent the previous evening at a local bar with several of the men who were gathered that morning, including the defendant, Chester Lee Jenkins.

Realizing that he needed a better method of communication, Captain Long asked Steve Reardon, Chuck Dossett, and the defendant, the three deaf men who had been at the bar with the victim, to meet with him at the sheriff's department at approximately 8:30 that morning to be interviewed with a sign language interpreter. The defendant failed to appear as scheduled. Reardon and Dossett, however, both showed up for their interviews, which were interpreted by Beth Foreman, a certified interpreter of American Sign Language. From them, Captain Long learned that the defendant and the victim had argued at the bar, and that the defendant had threatened to kill the victim and burn his house.

Captain Long then sent an officer to the defendant's house to bring him to the sheriff's department for questioning, where Foreman once again acted as interpreter. Captain Long read the defendant his rights, and had him sign a waiver of rights form, before beginning the interview. After several hours of questioning, and after having been informed that he had failed a polygraph examination, the defendant made the statement at issue in this case. Because the defendant has problems with reading and writing, Captain Long wrote the statement down as Foreman interpreted the defendant's signs into spoken English. In the statement, the defendant said that he had stopped by the victim's house on his way home from the bar, had become angry when the victim would not come to the door, and had thrown his lit cigarette into a pile of trash on the front porch. He said that he had seen smoke coming from the trash pile as he drove away, but had thought that the fire would go out.

Subsequently, the defendant filed an original and an amended motion to suppress, arguing that the statements taken from him by law enforcement officers were in violation of his rights guaranteed by the Fourth and Fifth Amendments to the United States Constitution and by Article I, Section 7 of the Tennessee Constitution.

At the suppression hearing, held March 12-14 and April 10, 2001, the defendant began with the presentation of evidence on his Fourth Amendment claim, calling Captain James Long as the first witness on this issue. Captain Long testified that the fire had been reported at 1:15 a.m., and that he had received a call to respond to the scene at about 2:00 a.m. Upon investigation, he and fellow fire investigator Bill Cliett had determined that the fire was incendiary in origin, caused by some person or persons igniting "[s]ome type of flammable liquid" that was poured over the trailer's front porch. Later that morning, during his interviews with Reardon and Dossett, he had learned that the defendant and the victim had argued at the bar, and that the defendant had threatened to burn the victim's house and to kill him. He said that Reardon told him that the defendant had made a slashing gesture across his neck, directed at the victim, as the victim left the bar.

Captain Long explained that the information that the defendant had threatened, approximately one to two hours before the victim died in the fire, to kill the victim and burn his house, combined with his failure to appear for his interview, led him to send an officer to the defendant's house to bring him to the department for questioning. He acknowledged that he had not obtained either an arrest or search warrant at that time but said that the defendant had not been arrested at that point, only asked to come to the department to talk with the investigators. Although Captain Long had not accompanied the officer, he had no recollection of there having been any issue about the defendant "not wanting to come." As for the defendant's status during the interview, Captain Long affirmed his testimony from an earlier hearing that the defendant was in custody at that time.

At the hearing, the defendant testified that he had been asleep on his living room couch when the police came into his home and awakened him. He first indicated that the officer had broken a door to enter his home. During cross-examination, however, he clarified that the officer had entered through a door that had previously been broken by someone else, and which he had not yet had a chance to repair.[1] He said that the officer woke him by tapping him on the shoulder, and then showed him a written note, on which the only words he could understand were "office" and "come here." The officer did not have a sign language interpreter with him. The defendant said that he had been shocked, confused, and scared, and felt "very awkward" when he arrived at the sheriff's department. He had wanted to telephone a friend, but the officers would not let him use the phone. Although they had allowed him to take smoke breaks, there was always an officer with him. He said that he had wanted to go home and was waiting for the officers to tell him that he could, but they never did.

The defendant acknowledged on cross-examination that tapping him on the shoulder was the only way that the officer could have made him aware of his presence at his house. He testified on redirect, however, that he had not invited the officers into his home, that he had not wanted them there, and that he had not wanted to be at the sheriff's department for questioning.

---

[1] The defendant testified through an interpreter of American Sign Language. There are several points during his testimony in which it appears that either he did not completely understand the question that was being asked, or the interpreter did not completely understand his answer.

The State then began the presentation of proof on the Fifth Amendment issue by calling Captain Long to testify about the interview process with the defendant. Captain Long said that he had obtained Beth Foreman's name from another officer, and that she had shown them her certification as an interpreter of sign language when she arrived at the department. The interview with the defendant took place in the conference room, and was attended by Long, Detective Scott Johnson, Beth Foreman, and the defendant. Captain Long said that he read the defendant his rights at the beginning of the interview, and Foreman interpreted them for him. The defendant indicated that he understood his rights and that he did not have any questions.

Captain Long testified that while the defendant appeared to look at the waiver of rights form before signing it, he did not know if the defendant had read it. He said that the defendant never asked either for a lawyer or that the interview stop, and that if he had, Long would have immediately concluded the interview. He could not recall if the defendant had asked to telephone a friend. He said that the defendant had first denied any involvement in the crime, but then eventually admitted that he had set the fire. Captain Long identified the defendant's signed statement and the transcript of the tape recording that had been made of the defendant's interview. Referring to this transcript, Captain Long explained that he had handwritten the defendant's statement sentence-by-sentence as Foreman interpreted the defendant's signs, stopping after each line to read it back to the defendant to ensure that he had written it exactly as the defendant wanted it to read. He said that the defendant told him that the statement was "perfect" and placed his initials on each page and his signature and the date at the end of the document.

Captain Long acknowledged on cross-examination that the interview had not been videotaped, and that the audio tape recorder had not been turned on until after the defendant's rights were read and explained to him. He could not recall the defendant asking him to clarify any of the Miranda rights. The first tape recording of the defendant's interview began at 10:44 a.m., while the second tape recording began at 5:12 p.m. During the time between these interviews, the defendant was administered a polygraph examination. Captain Long acknowledged that the defendant had told him that he had quit school after the fifth grade and had difficulty reading.

Beth Foreman testified that she has a "comprehensive skills certificate" through the National Registry of Interpreters for the Deaf, and has been working as a professional interpreter of American Sign Language ("ASL") since 1982. She said that she had completed a seven-week course in legal interpreting and received a provisional certificate in the area of judicial interpreting. She described the interpretation procedure she followed during the defendant's interview:

> For [the defendant], in particular, I asked him [Captain Long] to speak in chunks and not necessarily continue to talk. I much prefer to consecutively interpret than simultaneous. And consecutive is a chunk of information that I would take and process and analyze and come out with the appropriate meaning in order to sign it appropriately for [the defendant's] understanding.

-4-

Foreman testified that the Miranda warning was given in the same manner, with Captain Long reading each individual phrase and then pausing, while she signed the warning to the defendant. The defendant had not understood "a few things," but she had clarified them for him, before going on to interpret the next phrase. She explained that she does not sign the Miranda warning the same way every time because:

> The Miranda warnings is a frozen text, but the language of sign is not. It's a – what you do with a text or words is that you take the meaning from those words or that statement and you analyze it and you convert it to the target language, which is the language that I signed to [the defendant]. And it's not a word-for-word equivalency from English to sign, but it's a – it's the meaning that is conveyed. So, if you have – for example, if you have fifty interpreters in a room, all signing the Miranda warnings, you're not going to get any two interpreters signing exactly the same way. It's just the way a sign is conveyed.

On cross-examination, Foreman testified that she had interpreted the Miranda warning "probably less than ten" times in the past, and that she did not believe she had used videotape equipment in any of those prior interpretations. She said that she currently possesses a "Certificate of Legal Interpreting Provisional," and that she would need to pass both a written and a skills test in order to receive her specialist certificate in legal interpreting. She acknowledged that the test is available through the Registry of Interpreters for the Deaf, but said that she had not yet felt ready to take it.

During the preliminary hearing in this case, Foreman had been asked to sign the Miranda warning for the court. She testified, during the motion to suppress, that the way she signed the rights during that videotaped demonstration at the preliminary hearing was not the same way that earlier she had signed them at the sheriff's department prior to the taking of the defendant's statement, but she could not say exactly how she had signed the warning to the defendant. She explained, however, that she had not felt the pressure at the sheriff's department that she felt during the preliminary hearing, and that her interpretation during the defendant's interview, unlike the one she had given in court, had included interaction with the defendant. She said that the defendant had asked clarification on several points, and when that occurred she had signed the rights a different way until he indicated that he understood, at which point she had moved on to the next right. The defendant indicated his understanding either by signing "I understand," or by facial expression and nodding his head. She had not asked him to sign the rights back to her in his own words. Foreman testified that, after watching the videotape of her performance at the preliminary hearing, she believed she had made an accurate interpretation of the Miranda warning at the hearing.

In an effort to demonstrate that the defendant had not knowingly waived his Fifth Amendment rights, the defendant presented the testimony of Anna Witter-Merithew, Assistant Director for the Distance Opportunities for Interpreter Training Center in Denver, Colorado. After

her lengthy credentials had been presented, the trial court accepted her as an expert witness in the field of sign language interpretation. She testified that she had assessed the defendant's language abilities by interviewing him for several hours and reviewing his limited school records from the Tennessee School for the Deaf. She concluded that although the defendant uses conversational ASL, he lacks "native fluency" in the language, as demonstrated by his sporadic use of gestures and English-based signs[2] to convey many concepts for which there are standard signs in ASL. Thus, while the defendant could use ASL to convey nontechnical information about his daily life, he resorted to a combination of gestures and English-based signing in his attempts to convey anything of a more technical nature. The defendant did not, for example, know the ASL signs for judge, court, plea, arrest, or confession. Furthermore, although he attempted to use finger spelling, he was unable to correctly spell words, and showed difficulty in understanding terms that she finger spelled to him. Witter-Merithew said that the defendant expressed a naive and limited understanding of the legal system, and he believed that legal representation in his behalf had been obtained in this case by the prison nurse, who felt some "tenderness" toward him.

Upon request by defense counsel, Witter-Merithew reviewed the videotape of the defendant's polygraph examination in order to critique Foreman's interpretation skills for the court. She noted that Foreman had, at times, used English word order, rather than the word order of ASL, when interpreting the detective's questions. She explained that in ASL the interrogative form comes at the end, rather than at the beginning of the sentence, so that the words "Were you" in "Were you born in the month of July?" should be signed at the end of the sentence. She did not believe, based on her interview with the defendant, that he is able to understand English word order. Other problems that Witter-Merithew observed were Foreman's use of finger spelling for words other than proper nouns,[3] her use of inaccurate signs to convey the appropriate meaning of words, her consistent failure to use the "question form sign" to signal to the defendant that she was interpreting a question rather than a statement, and her omission or substitution of pronoun references.

Witter-Merithew testified that she had previously reviewed the videotape of Foreman's translation of the Miranda warning at the preliminary hearing, and that she had prepared a written report of her analysis of Foreman's interpretation, in which she had done a "back translation," or conversion of Foreman's signs back into English. Witter-Merithew said that Foreman's interpretation left out a number of the rights contained in the Miranda warning. Although Foreman had said that the defendant had the right to have an attorney represent him in court, she had not mentioned that the defendant had the right to have an attorney present during questioning. According to Witter-Merithew, Foreman also failed to convey that the defendant had the right to

---

[2]As Witter-Merithew explained in her written report, which is included in the record before this court, English-based signs are "considered to be 'artificial' by fluent ASL users due to how they were developed (outside of the Deaf Community, typically by non-deaf persons) and the use of initialization (the use of the first letter in the word) as part of the production of the sign."

[3]Witter-Merithew testified that in ASL finger spelling is restricted to proper nouns, and, further, that the defendant appeared to have great difficulty understanding finger spelling.

refuse to answer questions. Instead, she had told the defendant that he had the right "not to speak continuously with his voice" to answer questions. She said that Foreman additionally failed to establish the topic, or frame of reference, for concepts in her interpretation, and that she failed to signal the end of each thought by bringing her hands down to her side at the conclusion of her sentences.

Witter-Merithew explained that the term "deaf nod" refers to the tendency of some deaf individuals to indicate comprehension by nodding, when they do not necessarily understand what has been said, because of their desire to be perceived as cooperative and intelligent. She said that because of that phenomenon, interpreters are taught to use "elicitation techniques," such as asking the deaf person to paraphrase back to the interpreter what has just been explained, to ensure that the interpretation has been understood.

In rebuttal, the State presented Bob Furman, a teacher at the Tennessee School for the Deaf, who testified that he was friends with Beth Foreman and considered her interpreting skills to be "[a]bove average." However, on cross-examination he testified that Witter-Merithew's back translation of Foreman's interpretation of the Miranda warning was essentially accurate,[4] and agreed that Foreman's interpretation had omitted parts of the warning. Foreman, called as a rebuttal witness by the State, again testified that she believed that she had rendered an accurate interpretation of the Miranda warning at the preliminary hearing.

At the conclusion of the hearing, the trial court denied the motion on Fourth Amendment grounds, but sustained it on Fifth Amendment grounds, finding that the defendant had voluntarily accompanied the deputy to the sheriff's department for questioning, but that he had been in custody at the department and that the State had failed to demonstrate that Foreman had made an accurate translation of the Miranda rights. The State subsequently sought permission to file an interlocutory appeal of the trial court's decision to suppress the statement. In response, the defendant filed a motion in opposition, and, in the alternative, a motion for permission to appeal that portion of the trial court's ruling denying the motion to suppress on Fourth Amendment grounds. On May 8, 2001, the trial court granted both parties' motions to file an interlocutory appeal. By order dated June 28, 2001, this court agreed to grant both the State's application and the defendant's cross-application for interlocutory review, pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure.

## ANALYSIS

### I. Standard of Review

This court reviews the trial court's findings of fact at a suppression hearing under the following standard of review:

---

[4]Furman disagreed that Foreman's "talk" sign meant talk with one's voice as opposed to talk by signing.

> The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact at a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The trial court's application of law to the facts, however, is a question of law, which we review *de novo*. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). Additionally, "'the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001) (quoting State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000), and State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998)).

## II. Fourth Amendment Issue

The defendant contends that the trial court should have suppressed his statement not only on Fifth Amendment grounds, but also because he was denied the rights afforded by the Fourth Amendment and Article I, Section 7 of the Tennessee Constitution.

The defendant argues that his Fourth Amendment and Article I, Section 7 rights were violated when the deputy sheriff entered his home and took him to the department without a warrant, exigent circumstances, or his valid consent, and that the detectives exploited that unlawful seizure to obtain his subsequent statement. The State responds by first arguing that the evidence does not preponderate against the trial court's finding that the defendant voluntarily accompanied the officers to the sheriff's department for questioning, and thus, no Fourth Amendment unlawful seizure occurred. The State further argues that even if the defendant was unlawfully seized from his home, that illegal seizure would not, under New York v. Harris, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990), require the suppression of a statement he subsequently made while in lawful custody.

The Fourth Amendment to the United States Constitution provides:

> **Unreasonable searches and seizures.**–The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

A similar guarantee is provided in Article I, Section 7 of the Tennessee Constitution:

**Searches and seizures; warrants.**

> That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The essence of these constitutional protections is "to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting Camara v. Municipal Court, 387 U.S. 523, 528, 87 S. Ct. 1727, 1730, 18 L. Ed. 2d 930 (1967)). Since an individual's expectation of privacy is nowhere higher than when in his or her own home, a " basic principle of Fourth Amendment law" is "that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639, 651 (1980) (internal quotations omitted). Under the "fruit of the poisonous tree" doctrine, evidence that is obtained through exploitation of an unlawful search or seizure must be suppressed. See Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455 (1963).

The trial court denied the defendant's motion to suppress on Fourth Amendment grounds, finding that the defendant had voluntarily consented to accompany the officers to the sheriff's department:

> I find from the evidence that I have heard that there was not, that he wasn't placed under arrest, that he had been contacted the night before at the scene of the arson – or the fire, the alleged arson, and asked to come in along with other witnesses, that he didn't appear, and the officer went to get him. There wasn't any evidence of any compulsion used, or anything else, other than [the defendant] willingly went with them to the Sheriff's Department.

In its written findings of fact, the trial court reiterated its finding that the deputies had "asked" the defendant to go with them to the sheriff's department, and that the defendant had "complied without objection."

The State contends that the evidence preponderates in favor of the trial court's findings. It concedes that the officer entered the defendant's home without a warrant and without his consent, but argues that no Fourth Amendment seizure of the defendant occurred because the officer did not, by either physical force or show of authority, restrain the defendant's liberty to go about his business. It asserts that the officer's action in entering the defendant's home to awaken him by tapping him on the shoulder was reasonable in light of the defendant's deafness, and that any

-9-

reasonable person in the defendant's situation would have felt free to refuse the officer's request to accompany him to the sheriff's department.

We disagree that the defendant's deafness excused the officer's entry into the defendant's home without a warrant and without the defendant's consent, or that, under the totality of the circumstances, a reasonable person in the defendant's situation would have felt free to refuse to accompany the officers to the sheriff's department for questioning. The United States Supreme Court, holding that the Fourth Amendment prohibits the warrantless entry into a suspect's home to make a felony arrest, has stated that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton, 445 U.S. at 590, 100 S. Ct. at 1382, 63 L. Ed. 2d at 653. Here, the State failed to show any exigent circumstances that would have prevented the officer from either obtaining a warrant, or waiting until the defendant awoke and then seeking his permission to enter his home. The officer's entry into the defendant's home, therefore, was unlawful.

The defendant argued, both in the trial court and on appeal, that the entry into his home was in violation of Article I, Section 7 of the Tennessee Constitution. Our supreme court explained in State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001), the relationship between this section of the Tennessee Constitution and the Fourth Amendment:

> The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Article I, section 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures, and we have long held that this provision is identical in intent and purpose with the Fourth Amendment. See, e.g., State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000); State v. Vineyard, 958 S.W.2d 730, 733 (Tenn. 1997).

Accordingly, we conclude that the rights afforded the defendant by Article I, Section 7 of the Tennessee Constitution were violated by the entry into his home.

We also conclude, under the circumstances of this case, that the defendant did not voluntarily accompany the officers to the department for questioning. "Where a Fourth Amendment violation precedes consent, the validity of the consent depends on whether it was sufficiently an act of the free will, i.e. whether it was voluntary in fact." United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993). In this case, the totally deaf defendant was asleep in his home when he was awakened by a police officer tapping him on his shoulder, and then handing him a note on which, according to the defendant, the only words he could understand were "office" and "come here." The defendant testified that he was shocked and confused and that he did not understand what the officer wanted, other than for him to come with him to "talk." Without a sign language interpreter, it is unlikely that the defendant was able to question the officer in any detail about what he wanted, or that the officer

-10-

was able to effectively explain to the defendant that he was requesting, rather than demanding, that the defendant accompany him.

The State argues that the defendant's testimony at the suppression hearing reveals that he knew he had the choice to stay at home. However, the defendant's testimony on this topic was far from clear. When asked by defense counsel if he had thought he could have stayed home, the defendant answered, "Yeah, I thought I could stay home, yes." Asked again what he had thought when the officer said for him to come to the department, he replied:

> Well, he said, come on and I said what for, what does this mean. He wants to talk. So, I came with him here.[5] And then woman – deaf woman [sic], Beth, I didn't know who she was. I was very shocked and felt very awkward. I was just shocked.

As defense counsel persisted in questioning, the defendant continued to give confusing and somewhat contradictory responses:

> **Q.** When you came here, did they tell you you could go home?
>
> **A.** No. The police didn't tell me I could go home. No, didn't tell me that.
>
> **Q.** Did you think you could go home?
>
> **A.** Yeah, I thought – yes, I thought I could. The police didn't tell me anything.
>
> **Q.** Why didn't you go home?
>
> **A.** I don't know. I was just very awkward. And I didn't know if to leave or just keep waiting.
>
> **Q.** Mr. Jenkins, when the officer said come on, come on, out at your house –
>
> **A.** Yes. And I got in the car.
>
> **Q.** – did you feel like you needed to go with the police officer?

---

[5]The Blount County Sheriff's Department was located in the same building as the courtroom where the suppression hearing was held.

**A.** Well, the police just said come on, and I was puzzled. So, I didn't know what they wanted. I just – I was just puzzled and I was just kind of shocked.

**Q.** Can you tell the Court why you went with the police officer?

**A.** I didn't know what for, the police didn't tell me anything, didn't explain anything to me.

**Q.** Were you scared?

**A.** Yes, I was scared. I was wondering what was going on. And, you know, I thought maybe I'd get some help. And when we got here, I–I didn't know.

Thus, although the defendant testified that he "thought [he] could stay home," his ambiguous testimony makes it unclear whether he was trying to say that he thought that he could refuse the officer's request, or that he had thought he could stay home until the officer repeated that he was to come with him to the department. What is clear, however, is that he was unable to communicate with the officers and that they were unable to effectively communicate with him. Under these circumstances, the fact that the defendant may have, as the trial court found, "complied without objection" to the officer's request, is not enough to show that the defendant's consent to accompany the officers was sufficiently an act of his free will to be considered a voluntary decision on his part.

Nonetheless, we agree with the State that the defendant's subsequent statement was not obtained by exploitation of the unlawful entry to his home, and therefore, need not be suppressed on Fourth Amendment grounds. In New York v. Harris, 495 U.S. 14, 21, 110 S. Ct. 1640, 1644-45, 109 L. Ed. 2d 13, 22 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." The police officers in Harris, who had probable cause to arrest the defendant for murder, went to his home without first obtaining a warrant, knocked on his door, displaying guns and badges, and were admitted by the defendant. Id., 495 U.S. at 15, 110 S. Ct. at 1642. After having his rights read to him, the defendant agreed to answer the officers' questions and subsequently admitted killing the victim. Id., 495 U.S. at 16, 110 S. Ct. at 1642. He was then arrested and taken to the police department where he was once again informed of his rights before signing a written inculpatory statement. Id. The Supreme Court concluded that because the police had probable cause to arrest the defendant, the second statement made at the station was not the fruit of their illegal entry into his home, and thus, need not be suppressed. Id., 495 U.S. at 19, 110 S. Ct. at 1644. After noting its reluctance to adopt a "per se" rule that would limit any and all evidence resulting from a "chain of causation" that begins with an illegal arrest, the Court wrote:

-12-

In light of these principles, we decline to apply the exclusionary rule in this context because the rule in <u>Payton</u> was designed to protect the physical integrity of the home; it was not intended to grant criminal suspects, like Harris, protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime.

<u>Id.</u>, 495 U.S. at 17, 110 S. Ct. 1643.

In a thoughtful and well researched reply brief, the defendant argues, *inter alia*, that the rationale of <u>Harris</u> has not been adopted in Tennessee, and that we should decline to do so. However, we respectfully disagree with his argument in this regard, as well as his distinguishing the facts in <u>Harris</u> from those in the instant case. Thus, applying <u>Harris</u>, we conclude that the trial court did not err in denying the defendant's motion to suppress his statement on Fourth Amendment grounds. According to Captain Long, witnesses at the bar had observed the defendant threatening to kill the victim and burn his house down approximately one to two hours before the fire occurred that claimed the victim's life. Moreover, the defendant failed to appear for his interview as he had agreed. Thus, the officers had probable cause to arrest the defendant and take him into custody before he made his statement at the department. Because probable cause existed for the defendant's arrest, the exclusionary rule does not require that his subsequent statement made while in lawful custody be suppressed. <u>See id.</u>, 495 U.S. at 19, 110 S. Ct. at 1644; <u>see also</u> <u>State v. Huddleston</u>, 924 S.W.2d 666, 672 n.3 (Tenn. 1996) (recognizing that "violation of the Fourth Amendment's rule against warrantless arrests in a dwelling generally does not lead to suppression of a post-arrest confession").

Accordingly, although we have determined that the entry into the defendant's home violated the rights afforded to him by the Fourth Amendment to the United States Constitution and by Article I, Section 7 of the Tennessee Constitution, applying the rationale of <u>New York v. Harris</u>, we conclude that this violation of his rights does not require the suppression of his subsequent confession.

### III. Fifth Amendment Issue

The State contends that the trial court erred in granting the defendant's motion to suppress his statement on Fifth Amendment grounds, arguing that the defendant was not in custody and that, even if he was, the evidence shows that Foreman adequately interpreted the <u>Miranda</u> warning to him before he made his statement. We disagree.

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. <u>See</u> U.S. Const. amend. V; Tenn. Const. art. I, § 9. To be admissible at trial, a confession or statement made while under custodial interrogation must be shown to have been freely and voluntarily made, after the defendant's knowing waiver of his

constitutional right to remain silent, or to have an attorney present during questioning. See <u>Miranda</u> <u>v. Arizona</u>, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966).

As an initial matter, we conclude that the record in this case fully supports the trial court's finding that the defendant was in custody while at the department and, thus, that <u>Miranda</u> warnings were required before law enforcement officials began their interview. Captain Long unequivocally testified at both the preliminary and suppression hearings that the defendant was in custody during the interview. Moreover, in spite of the defendant's statement that he thought he could go home, which the State cites in support of its argument that he was not in custody, elsewhere in his testimony he indicated that he had not felt free to go anywhere without the officers' permission.

The State contends that even if he was in custody, the evidence "establishes that the defendant was properly informed of his <u>Miranda</u> rights." The State argues that the trial court erroneously "presumed" that Foreman's interpretation to the defendant was inadequate based on deficiencies in her interpretation during the preliminary hearing, suggesting that it gave insufficient consideration to her testimony that she had not signed the rights to the defendant in the same way that she signed them at the preliminary hearing. The State points out that both Foreman and Captain Long testified that she signed the <u>Miranda</u> warning to the defendant one phrase at a time, to ensure that he completely understood his rights. The State argues that this procedure, unlike that utilized at the preliminary hearing, would have made it "highly unlikely" that Foreman skipped one of the rights. As further support for its claim that the defendant was adequately informed of his rights, the State also notes testimony from prison officials indicating that the defendant is able to read and write to some extent, and testimony by Captain Long that the defendant looked at the waiver of rights form before signing it.

In its written findings of fact on this issue, the trial court found as follows:

> From the proof presented, Jenkins had very limited reading and writing ability and can communicate through written [E]nglish on a very low level. Captain Long read the <u>Miranda</u> warnings, phrase by phrase, from the form submitted as "Exhibit No. 1". Beth Foreman translated into American [S]ign Language each phrase to Jenkins and received an acknowledgment from Jenkins that he understood each phrase before indicating to Long that he should continue. Jenkins looked at the <u>Miranda</u> waiver form before affixing his signature to it, but had little opportunity to attempt to read it.

The record supports the trial court's findings in this matter. No evidence was presented to show that the defendant was able to read the waiver of rights form before signing it. When questioned on this subject, Captain Long acknowledged that although he had seen the defendant look at the document, he was not sure if he had read it. He also acknowledged that the defendant had told him that he had quit school after the fifth grade, and that he had problems with reading and writing.

Captain Long explained, in fact, that the defendant's difficulty with reading and writing was the reason that he had written his statement for him.

The State also failed to present sufficient evidence to show that Foreman accurately translated the <u>Miranda</u> warning to the defendant. Because no videotape of the interview was made, there is no record of exactly what Foreman communicated to the defendant. Foreman testified that there is no word-for-word equivalency from written or spoken English into sign language, and said that she had interpreted the <u>Miranda</u> warning to the defendant by taking a "chunk" of information, "process[ing]" it, and arriving at an "appropriate" interpretation for his understanding. She said that she had clarified several points when he had asked her, and that he had indicated his understanding by signing "I understand," or by nodding his head. She had not asked him to paraphrase the warning back to her. She also testified that she had interpreted the <u>Miranda</u> warning less than ten times in the past, and that she did not yet feel prepared to take the examination required in order for her to receive her specialist certification in legal interpreting.

Foreman believed that she had made an accurate translation of the warning to the defendant. However, she also believed that she had accurately translated the warning during the preliminary hearing, in spite of Anna Witter-Merithew's "back translation" of that demonstration, accepted by the State's sign language expert as essentially accurate, which reveals that she omitted several key concepts from the warning, including that the defendant had the right to have an attorney present during questioning. The back translation reads as follows:

> Imagine there is a Detective or Policeman on my right, and that I am standing here interpreting for you. OK.
>
> The police asks you...You know that here at the location where the police are, you do not have to continuously use your voice to speak to him everything. (referent omitted)...experience, answer...You don't have to tell him everything again and again. You can keep it to yourself.
>
> If you do tell the police everything, during his questions, you tell him everything, maybe at a later time (someone) will bring (someone) before the judge here in court. The judge will inform everyone what you said.
>
> But, you have a choice. You can now use your voice to continuously speak, or you can say nothing. So, it is up to you. It is your decision.
>
> Also, you can use your voice to talk to another man or woman that someone will select to come meet you and discuss your situation. You can explain/describe (something) to that individual, a lawyer.

-15-

That person can become your representative, so that here in court that person will sit beside you and support you and tell your story for you.

Let's say...You know that person that will be picked for you to talk about (something) for you in court? That is who I am talking about. That person is a professional and has...well, um...You don't have to pay them, unless you can afford to pay them for working for you. So, um.....But, you have a right. So, that is your choice. You can get a lawyer that you don't have to pay or you can pay them. It doesn't matter.

You might be brought to court at some later time. You....if you want to tell it all yourself, that will be fine. You have choices. Or, you can find someone else to come and meet and support you. That person could use their voice to speak for you. It is your choice.

Um, well, it also says here in the document that if you are under the age of 18, you..your parents could come to court and use their voices to speak for you. So...but..since you are not under the age of 18, this part doesn't relate to you.

As to the sufficiency of the <u>Miranda</u> warning, the trial court found as follows:

At the preliminary hearing, Beth Foreman demonstrated her translation of the <u>Miranda</u> warnings while she read them from the same form used by Captain Long. After watching a video recording of her translation of the <u>Miranda</u> warnings at the preliminary hearing, Ms. Foreman testified in this hearing that her translation was an "accurate translation of <u>Miranda</u>". The defense witness, Anna Witter-Merithew, filed as an exhibit a back-translation she prepared of Ms. Foreman's translation at the preliminary hearing. Both Beth Foreman and the State's expert witness, Bob Furman, reviewed the back-translation prepared by the defense witness, Witter-Merithew, as well as the video recording of the actual translation by Beth Foreman during the preliminary hearing. Both Foreman and Furman agreed that the back-translation is an accurate rendition in English of the translation by Ms. Foreman at the preliminary hearing. Therefore, the Court find[s] that although Beth Foreman believes what she translated in the preliminary hearing accurately conveys the <u>Miranda</u> warnings, clearly the back-translation demonstrates that it is not close to an accurate communication of <u>Miranda</u>. The translation omitted the concept that statements made by the defendant could be used against the defendant, omitted the concept that the defendant had the right to an attorney present during questioning, omitted the concept that the defendant could stop answering questions at any point, and was vague as to the concept of the right to remain silent. In that Beth Foreman testified that her translation of <u>Miranda</u> to Jenkins was somewhat similar to the in-court demonstration (the difference being the lack of response from the defendant) the Court finds that the <u>Miranda</u> warnings were not accurately communicated to Mr. Jenkins. Ms. Foreman testified that she accurately translated

<u>Miranda</u> phrase by phrase, and there is no suggestion in the evidence that her understanding of what constitutes a correct translation of <u>Miranda</u> warnings was any different on the day Jenkins was questioned than on the day of the preliminary hearing. In fact Ms. Foreman testified on two occasions and never said that there was anything left out of her demonstration at the preliminary hearing.

Since Foreman's translation procedure appears to depend upon her understanding of what she is interpreting, her inability to recognize errors and omissions in her translation during the preliminary hearing casts doubt upon the completeness of her translation to the defendant. Furthermore, even if she had rendered an accurate translation, her failure to ask the defendant to paraphrase the warning back to her, combined with Witter-Merithew's testimony that he is unable to understand English word order and finger spelling, which Foreman used during the polygraph examination, creates doubt about whether the defendant would have been able to understand the warning as she interpreted it. In the absence of proof that Foreman rendered an accurate and understandable interpretation of the <u>Miranda</u> warning, the defendant's waiver cannot be considered knowing and voluntary. We therefore affirm the trial court's decision to sustain the defendant's motion to suppress his statement on Fifth Amendment grounds.

## CONCLUSION

Because probable cause existed for the defendant's arrest, we conclude that his statement made while in lawful custody at the sheriff's department was not the fruit of his unlawful seizure at his home, and therefore need not be suppressed on Fourth Amendment or Article I, Section 7 grounds. However, because the State failed to show that the defendant received an adequate <u>Miranda</u> warning before waiving his Fifth Amendment right to remain silent or have a lawyer present during questioning, we conclude that the statement must be suppressed on Fifth Amendment grounds. Accordingly, the judgment of the trial court suppressing the statement is affirmed.

_____
ALAN E. GLENN, JUDGE