# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs April 1, 2003

## STATE OF TENNESSEE v. VOSS JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 00-10179, 80, 81, 82     Bernie Weinman, Judge**

---

**No. W2002-01487-CCA-R3-CD  - Filed August 27, 2003**

---

Following a jury trial, Defendant, Voss Johnson, was convicted of two counts of especially aggravated robbery, one count of attempted voluntary manslaughter, and one count of second degree murder. Defendant now appeals his convictions arguing that the trial court erred in denying his motion to suppress and that the evidence is insufficient to sustain his conviction for second degree murder based on a theory of criminal responsibility. After a careful review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Trial Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and DAVID G. HAYES, J., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Voss Johnson.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Camille McMullen, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On the evening of February 5, 2001, Defendant, along with his brother, Odell Pegues, and his cousin, Terry Wallace, dressed in black clothes and slipped out of an upstairs window at Defendant's grandmother's house. The men proceeded to a neighborhood grocery store located approximately two houses down from Defendant's house. The victims, Adnan Morshid and Idris Abdo Modhime, had just closed the store and were in the process of leaving. Mr. Modhime was in his car when he noticed that Mr. Morshid was having trouble starting his vehicle. Mr. Morshid waved at Mr. Modhime and then walked over to Mr. Modhime's car. Mr. Modhime had just opened the car door when he heard a gunshot and Mr. Morshid fell to the ground. Mr. Modhime looked to his left and saw Defendant. He slid over to the passenger side of the car as Defendant shot him. The bullet passed through Mr. Modhime's neck and exited his mouth. Defendant asked for money and

Mr. Modhime gave him his wallet, then lay down on the seat and played dead. The other two men knelt on the ground and searched Mr. Morshid's pockets while Defendant searched Mr. Modhime. As they left, one of the men fired once more at Mr. Modhime's vehicle. Although the store's lights were off, the parking lot was lit by a street light on the corner, and Mr. Modhime recognized the perpetrators as frequent patrons of the store.

Demetri Pegues, Defendant's cousin, arrived at Defendant's grandmother's house shortly before nine o'clock that night to pick up Defendant and Odell Pegues who were supposed to spend the weekend at her house. When she discovered that Defendant had left the house, Ms. Pegues drove around the neighborhood searching for him. A friend suggested that Ms. Pegues search the neighborhood shopping center. As Ms. Pegues passed the parking lot in front of the grocery store, she noticed a car. One man lay on the ground next to the car and another man leaned over him apparently trying to aid the fallen man. Ms. Pegues turned her car around and drove to the parking lot. When she saw the extent of Mr. Modhime's injuries, Ms. Pegues called 911 on her cell phone. Although Ms. Pegues saw Mr. Morshid breathe a couple of times after she arrived, he was dead before assistance arrived.

Officer Felicia Shipp with the Memphis Police Department received a call between 9:30 and 10:00 p.m. concerning the incident at the grocery store. When she arrived, Officer Shipp verified that Mr. Morshid no longer had a pulse and then turned her attention to Mr. Modhime. Because he was bleeding from his mouth, Mr. Modhime could not speak, but he responded to Officer Shipp's questions through gestures indicating that there were three perpetrators and that the perpetrators were black. Officer Shipp discovered some money strewn around the parking lot and assigned an officer to guard the bills.

Officer Kevin Shaver was on duty with the Memphis Police Department's crime scene division that night. His investigation of the scene revealed indentations in the side of Mr. Modhime's car that appeared to have been made by shotgun pellets. A spent shotgun casing lay next to Mr. Morshid. Officer Shaver discovered several shotgun waddings on the parking lot, although some of the waddings appeared to have been deposited prior to the incident. The freshest wadding, however, was located next to Mr. Modhime's car. Two spent bullets and a tooth were discovered in the passenger seat of Mr. Modhime's car, and a spent bullet fell out of Mr. Morshid's shirt when the officers moved him to search for an exit wound.

Sergeant T. J. Helldorfer questioned Ms. Pegues who told him that she was driving by the grocery store in an attempt to locate Defendant who was supposed to be at his grandmother's house but was missing at the time of the incident. Interviews of various people in the neighborhood revealed that Defendant's neighbors considered Defendant, Mr. Pegues and Mr. Wallace to be "problem kids." Based on this information, Sergeant Helldorfer included Defendant's picture in a photographic line-up which was shown to Mr. Modhime in the hospital. Although Mr. Modhime was unable to talk because he was on a ventilator, he pointed to Defendant's picture as the man who shot him.

On February 7, Ms. Adriane Johnson, a resident of the home, consented to a search of the home in which Defendant resided. Defendant, Terry Wallace and Odell Pegues were placed under arrest prior to the search. In the upstairs bedroom, Sergeant Terry Landrum found a blue vase containing one spent .38 bullet and three live bullets. Beneath an end table at the end of a couch were several pieces of black clothing, a black and white bandanna and a pair of red gloves.

The officers returned later that day with a search warrant. Sergeant Landrum discovered a .38 Rossi with three live bullets in the chamber, hidden beneath an organ. A sawed-off 97 Winchester pump 12-gauge shotgun was located in a dog food sack in a van parked next to the house. Officer Cham Payne also discovered a red and black nail gun.

Sergeant Helldorfer left the search before it was finished to prepare for Defendant's interview. Defendant arrived at the police station at approximately 1:00 p.m., but the interview was delayed until the arrival of Voss Nailing, Defendant's father, who would serve as Defendant's guardian during questioning. When Mr. Nailing arrived shortly before 2:00 p.m., Sergeant Helldorfer read Defendant his rights and then had Defendant read the rights to him to ascertain his reading comprehension. Defendant said that he understood and agreed to waive his rights. Defendant and Mr. Nailing signed the waiver form at approximately 1:50 p.m.

Defendant at first denied that he was present at the grocery store when the shooting occurred and said he was at Demetri Pegues' house that evening. Because Ms. Pegues had already told the police she did not know where Defendant was on February 5, the investigators left Defendant and proceeded to interview Mr. Wallace and Mr. Pegues. The men were interviewed separately, and Mr. Nailing served as guardian for all three men. Sergeant Helldorfer resumed questioning Defendant at 11:08 p.m. and read Defendant his rights again. Once again, Defendant said that he understood his rights, and he and his father signed the waiver form. In this interview, Defendant said that his cousin, Terry Wallace, shot Mr. Morshid. Mr. Wallace told Defendant earlier in the evening that he intended to rob the victim. When Mr. Wallace left his grandmother's house dressed in black and armed with a revolver, Defendant and Mr. Pegues sat outside on the hood of a car. They heard three shots and then saw Mr. Wallace running up McLemore toward Glenview Park. Defendant walked down to the grocery store and saw one man on the ground beside the car and another man laying on the car's front seat. When he returned home, Mr. Wallace was there, and Mr. Wallace and another relative dropped Defendant off at Ms. Pegues' house. The second interview concluded at midnight.

Sergeant Helldorfer left Defendant and his father in the interview room while he arranged Defendant's transportation to juvenile court. When he returned, Defendant, his father and Sergeant Helldorfer were standing in the doorway when Defendant suddenly stopped and said that he wanted to tell Sergeant Helldorfer what really happened that night. The men went back into the interview room, and Defendant made a third statement at 2:08 a.m. Sergeant Helldorfer read Defendant his rights, and Defendant indicated he understood them and wished to make a statement. In this statement, Defendant said that Mr. Wallace suggested around 9:00 p.m. that he and Defendant rob the grocery store. The store was still open for business on their first visit, so they waited. When Defendant and Mr. Wallace returned, Mr. Modhime and Mr. Morshid were talking by Mr.

Modhime's car. Defendant ran up to Mr. Morshid who put his hands in the air. When Mr. Morshid tried to touch Defendant's gun, Mr. Wallace fired three shots, one at Mr. Morshid, one at Mr. Modhime, and one in the general direction of the car. Mr. Wallace grabbed some money out of Mr. Morshid's pockets, and the men then ran back to Defendant's grandmother's house. A relative dropped Defendant off at Ms. Pegue's house, and then drove off with Mr. Wallace. Defendant was armed with a 12-gauge shotgun but he said that he only fired the gun after he had left the store's parking lot. Defendant said he hid the gun in a dog food bag in a van. The next day, Mr. Wallace bought Defendant a hat with the stolen money, and the two men watched a movie and had something to eat. Defendant said that he did not know that Mr. Wallace was going to fire his weapon. As far as Defendant knew, all the men planned to do was "a normal robbery without hurting nobody."

Teric Jones, a friend of Defendant and Mr. Wallace, came over to visit the men that Friday around seven o'clock. As they watched a football game on television in Defendant's bedroom, Mr. Wallace went downstairs to change clothes. Defendant changed clothes in the bedroom. Mr. Wallace came back upstairs, retrieved his .38 revolver, and asked Mr. Jones if he was coming with them. Mr. Jones said "no," and Defendant, Mr. Wallace and Mr. Pegues climbed out of the upstairs window. Mr. Jones left the house by the front door. On his way home, he saw Defendant and Mr. Wallace, but Mr. Jones did not stop. The next day, Mr. Jones saw Defendant and Mr. Wallace once more, and the men had new clothes and shoes although they did not have any money the night before. Defendant told Mr. Jones he had a new hat but did not say where he got the money to pay for it.

Dr. Cynthia Gardner, the assistant medical examiner for Shelby County, performed an autopsy on Mr. Morshid on February 7. The autopsy revealed one gunshot wound to the chest. The bullet traveled through Mr. Morshid's heart, his left lung, the intestines and spleen before exiting his back. Dr. Gardner also found multiple shotgun pellet wounds on Mr. Morshid's buttocks, thighs and the lower portion of his legs. The gunshot wound in Mr. Morshid's chest did not have any soot or stippling so Dr. Gardner estimated that the gun was shot from more than two feet away. The chest wound was "rapidly fatal," but the pellet wounds occurred at approximately the same time and at least incapacitated the victim. Because she could not rule out the effect of the pellet wounds on Mr. Morshid, Dr. Gardner determined that the cause of death was from multiple gunshot wounds.

The jury convicted Defendant of the especially aggravated robbery of Mr. Modhime, the especially aggravated robbery of Mr. Morshid, the lesser included offense of attempted voluntary manslaughter of Mr. Modhime and the lesser included offense of second degree murder of Mr. Morshid. The trial court sentenced Defendant to twenty years for each of the especially aggravated robbery convictions, twenty-five years for the second degree murder conviction and four years for the attempted voluntary manslaughter conviction. The trial court ordered the especially aggravated robbery and attempted voluntary manslaughter sentences pertaining to Mr. Modhime to run concurrently, and the especially aggravated robbery and second degree murder sentences pertaining to Mr. Morshid to run concurrently. The trial court then ordered the sentences relating to the offenses against Mr. Modhime to run consecutively to those concerning Mr. Morshid for an effective sentence of forty-five years. Defendant now appeals his convictions arguing that the trial court erred

in not denying his motion to suppress evidence and that the evidence is insufficient to sustain his conviction for second degree murder based on a theory of criminal responsibility.

## b. Motion to Suppress

At the suppression hearing, Sergeant Helldorfer testified that Defendant's cousin, Demetri Pegues, told him that Defendant was supposed to be at his grandmother's house the night of the killing, but Defendant had disappeared when she looked for him around 9:30 p.m. The house was located two houses down from the grocery store. When he interviewed Defendant's neighbors, Sergeant Helldorfer learned information concerning Defendant's background and reputation as a "problem kid." Based on this information, Sergeant Helldorfer included Defendant's picture in the photo lineup that was eventually shown to the surviving victim, Mr. Modhime, who was recuperating in the hospital. Sergeant Helldorfer showed Mr. Modhime three photo spreads each containing six photographs. Mr. Modhime could not talk because he was on a ventilator, but he pointed to Defendant's picture as the man who shot him and later made a statement concerning his identification of Defendant as the perpetrator.

After his visit with Mr. Modhime, Sergeant Helldorfer executed a consensual search at Defendant's grandmother's house where he found Defendant along with Terry Wallace and Odell Pegues. The men were arrested, handcuffed and driven separately to the police station. Defendant was taken directly to the interview room. After Mr. Nailing arrived, Defendant was read his rights. He indicated he understood and both Defendant and his father signed the waiver form. Defendant initially denied any involvement in the offenses. Because Defendant's statement did not agree with the information provided by the other two suspects, Sergeant Helldorfer left Defendant alone in the interview room while the other two men were interviewed separately. Sergeant Helldorfer said that the interview process took longer than might otherwise occur because Defendant's father served as guardian for all three suspects. Sergeant Helldorfer did not speak to Defendant again until 9:42 p.m.

Defendant gave a second statement at 11:08 p.m. after being read his rights and executing a waiver form. He and Mr. Nailing signed the statement at midnight, and Mr. Helldorfer left to arrange Defendant's transportation to juvenile court. When Sergeant Helldorfer returned, Defendant said that he wanted to make another statement to tell what really happened. After being read his rights, Defendant made a third statement in which he admitted participation in the offenses and signed the statement at 2:31 a.m. According to Sergeant Helldorfer, an arrest warrant was issued later that morning.

At the conclusion of the suppression hearing, the trial court found that the police officers had probable cause to execute a warrantless arrest of Defendant based on the victim's identification of Defendant as the one who shot him. The trial court further found that Defendant was advised of his rights, knowingly waived those rights and freely and voluntarily made his statements with his father present. Accordingly, the trial court denied Defendant's motion to suppress, and Defendant now appeals that denial.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this Court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this Court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

In Tennessee, an officer may arrest an individual without a warrant when a felony has been committed, and the officer has reasonable cause to believe that the person arrested committed the felony. Tenn. Code Ann. § 40-7-103(a)(3); *State v. Mitchell*, 870 S.W.2d 532, 538 (Tenn. Crim. App. 1993). Whether probable cause exists depends upon whether the facts and circumstances known to the officer were sufficient for a prudent person to believe that the individual had committed the offense. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964); *see also State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997). Based primarily upon the victim's identification of Defendant as the perpetrator of the offense, the trial court determined, and Defendant does not disagree, that Sergeant Helldorfer had sufficient probable cause to arrest Defendant. The evidence does not preponderate against this finding.

Nonetheless, Defendant argues that once an individual is arrested without a warrant, he or she may only be detained for purposes of booking and processing. Defendant argues that a detention for the sole purpose of gathering additional incriminating information through the accused's statements while in custody violates the accused's Fourth Amendment rights as set forth in *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991). Accordingly, Defendant contends that his detention was unlawful, and the trial court erroneously denied the suppression of his statement. After a thorough review of the record, we respectfully disagree.

"The Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to the extended detention of an individual after a warrantless arrest." *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (*citing Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)). A judicial determination of probable cause is generally considered "prompt" if it is made within forty-eight hours. *McLaughlin*, 500 U.S. at 56, 111 S. Ct. at 1670. "The issuance of a valid arrest warrant satisfies the requirement that there must be a judicial determination of probable cause for extended detention." *Carter*, 16 S.W.3d at 766.

Following Defendant's identification by the victim, Defendant was arrested without a warrant around 1:00 p.m. on February 7, 2000. At 2:31 a.m., some thirteen hours later, Defendant voluntarily confessed to his involvement in the offense. Although Defendant's arrest warrant was

not made a part of the record, Sergeant Helldorfer testified that an arrest warrant was issued later that morning, well within the forty-eight-hour rule set by *McLaughlin.*

As Defendant points out, however, not all probable cause determinations pass constitutional muster even if determined within forty-eight hours of the accused's warrantless arrest. *McLaughlin,* 500 U.S. at 56, 111 S. Ct. at 1670. As the Court noted,

> [s]uch a hearing may nonetheless violate *Gerstein* if the arrested individual can prove that his or her probable cause determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake.

*Id.*; *see also State v. Huddleston*, 924 S.W.2d 666, 676 (Tenn. 1996).

Defendant relies on the Tennessee Supreme Court's decision in *Huddleston* to support his position that his detention was unlawful. Defendant argues that the police had sufficient probable cause to issue an arrest warrant immediately, and his detention after that point was solely for the purpose of gathering additional information to further justify his arrest. The situation faced by the court in *Huddleston*, however, is clearly distinguishable from the case *sub judice*. In *Huddleston*, the police officer, although he lacked sufficient probable cause to do so, arrested the defendant without a warrant on a Friday afternoon for his suspected involvement in an armed robbery. The defendant was detained in the city jail over the weekend, and confessed to the crimes on Monday afternoon. On Tuesday, more than seventy-two hours after his arrest, the police obtained an arrest warrant supported only by Defendant's confession. The police officer who executed the warrantless arrest admitted that he detained the defendant so that the police could "continue the investigation and develop additional evidence." *Huddleston*, 924 S.W.2d at 676. Because the defendant was held more than seventy-two hours without a judicial determination of probable cause and the State failed to justify the delay, the *Huddleston* court found that the defendant's Fourth Amendment rights were violated. *Id.* at 675.

The judicial probable cause determination in Defendant's situation, however, was made well within the *McLaughlin* forty-eight hour rule. In *Huddleston,* the supreme court noted that "[o]bviously, if the statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of illegality and should not be suppressed." *Id*. If probable cause exists for an arrest, "the exclusionary rule does not require that [the accused's] subsequent statement made while in lawful custody be suppressed." *State v. Jenkins*, 81 S.W.3d 252, 264 (Tenn. Crim. App. 2002); *see also New York v. Harris*, 495 U.S. 14, 21, 110 S. Ct. 1640, 1644, 109 L. Ed. 2d 13 (1990).

Following Defendant's arrest, the police were justified in questioning Defendant concerning his involvement in the offense. Defendant could have terminated the questioning at any time. Defendant acknowledged he understood and waived his right against self-incrimination, and Defendant's father was present each time he was interviewed. The length of the detention was also

caused in part by the complexities of simultaneously interviewing three minor co-defendants who each relied on Mr. Nailing as their guardian. The *McLaughlin* court cautioned that "courts must allow a substantial degree of flexibility" in evaluating whether a particular detention is unreasonable recognizing that some delays, based on practical realities, will be unavoidable. *McLaughlin*, 500 U.S. at 56-57, 111 S. Ct. at 1670.

Defendant is not entitled to relief on this issue.

**b. Sufficiency of Evidence**

Defendant does not contest his convictions for attempted voluntary manslaughter or especially aggravated robbery. He does, however, argue that the evidence is insufficient to sustain his conviction for second degree murder either as a principle or under a theory of criminal responsibility.

Defendant, along with his co-defendants, Terry Wallace and Odell Pegues, was indicted for felony murder during the perpetration of a robbery. *See* Tenn. Code Ann. § 39-13-202(a)(2). The jury was provided instructions concerning the lesser-included offenses of second degree murder, voluntary manslaughter and reckless homicide. The trial court also instructed the jury on the theory of criminal responsibility. After deliberation, the jury found Defendant guilty of the lesser-included charge of second degree murder.

The evidence showed that Mr. Wallace was in possession of the .38 revolver that fired the bullet that killed Mr. Morshid. In response to Mr. Wallace's shots, Defendant fired his shotgun at the victim, spraying his buttocks and the backs of his legs with pellets. These shots, Defendant argues, did not contribute to the victim's death. Defendant also denied knowing that Mr. Wallace intended to shoot the victim. All he thought was going to happen was a "normal robbery." In response, the State contends that the evidence is sufficient to sustain Defendant's conviction for second degree murder under a theory of criminal responsibility. We agree.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual

issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"[C]riminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offenses . . . based upon the conduct of another." *State v. Lemacks*, 966 S.W.2d 166, 170 (Tenn. 1999). "A person is criminally responsible for an offense committed by the conduct of another if [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (1997). The common law rule of natural and probable consequences survived the codification of the current criminal responsibility statute, although not specifically expressed, and extended criminal liability not only to the offense intended by a defendant, but also to "collateral crimes committed by a co-defendant that were the natural and probable consequence of the target crime." *State v. Richmond*, 90 S.W.3d 648, 654 (Tenn. 2002); *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000); *State v. Carson*, 950 S.W.2d 951, 956 (Tenn. 1997). Thus, an accused may be criminally responsible even if "the criminal conduct of others differs from or exceeds the scope of the target crime." *Richmond*, 90 S.W.3d at 655.

A particular outcome of criminal conduct is a natural and probable consequence if it falls within "'a reasonably predictable range.'" *Howard*, 30 S.W.3d at 276 (quoting *Carson*, 950 S.W.2d at 955). This determination is "within the province of the jury as finder of fact." *Id.* "[T]o impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime. *Id.*

When Defendant and the others slipped out of their bedroom window that night, Terry Wallace was armed with a .38 revolver and Defendant carried a 12-gauge shotgun. All three changed into black clothing before leaving Defendant's grandmother's house. Their plan was to rob the neighborhood grocery store which they often frequented. When they arrived, Defendant shot Mr. Modhime while Mr. Wallace shot Mr. Morshid who later died. The men, including Defendant, searched the victims' pockets extracting what money they could. The following day, Defendant, along with Mr. Wallace, bought new clothes and shoes, saw a movie and had something to eat, all on the proceeds of the robbery.

Although he cites no authority as support, Defendant also appears to argue that he can only be criminally responsible for murder in the first degree since his co-defendant was convicted of felony murder based on Mr. Morshid's killing during the perpetration of a robbery. In other words, if Defendant is responsible for Mr. Wallace's conduct, then he is only responsible for felony murder, and his conviction for second degree murder should be overturned. While it was true that the jury could have convicted Defendant of felony murder under a theory of criminal responsibility, they chose to convict him of second degree murder. Second degree murder is clearly a lesser-included

offense of felony murder. *State v. Locke*, 90 S.W.3d 663, 669 (Tenn. 2002); *State v. Ely*, 48 S.W.3d 710, 721-22 (Tenn. 2001).

Based on the foregoing, we find that the evidence was sufficient to sustain Defendant's conviction for second degree murder beyond a reasonable doubt. Defendant is not entitled to relief on this issue.

## Conclusion

After a careful review of the record, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE