IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 2, 2011

**STATE OF TENNESSEE v. JOSUE SEGURA**

**Appeal from the Criminal Court for Shelby County**
**No. 07-00667     John T. Fowlkes, Judge**

_____

**No. W2010-00952-CCA-R3-CD  - Filed September 18, 2012**

_____

The defendant, Josue Segura, was convicted by a Shelby County jury of first degree premeditated murder and was sentenced to life imprisonment. In this appeal, Segura argues that the trial court erred by denying his motion to suppress, by refusing to grant a second mental evaluation, and by allowing the State to introduce certain photographs of the victim. Segura also challenges the sufficiency of the evidence supporting his conviction. After a thorough review of the record and applicable authority, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

H. Andrew Crisler, III (on appeal) and Arthur E. Horne, III (at trial) Memphis, Tennessee, for the Defendant-Appellant, Josue Segura.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William L. Gibbons, District Attorney General; Theresa S. McCusker and Chris West, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

On May 27, 2006, the body of Daniel Darby, the victim, was found in a rut in an area of Memphis known as "Frayser bottoms." The victim's skull had been crushed as a result of five to seven blows to his head with a blunt object. Segura was the last person to be seen with the victim. Two days after the victim's body was found, Segura told authorities that he struck the victim seven times with a lead pipe in self-defense.

**Motion to Suppress.** Segura filed a motion to suppress his statements because they were obtained in violation of his "Fifth Amendment rights under the United States Constitution and Article I[,] § 9 of the Tennessee Constitution." He also claimed his statements were involuntary because he did not knowingly and intelligently waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

At the suppression hearing, Detective Milton Gonzalez, a native Spanish speaker who was employed with the Project Safe Neighborhoods task force of the Memphis Police Department, testified that he assisted officers investigating the death of the victim. He arrived at the homicide bureau around 9:00 or 10:00 p.m. on May 29, 2006. He was briefed on the circumstances of the case and entered the room where Segura was seated. Detective Gonzalez initially spoke with Segura in English to determine how much of the English language Segura understood. At the time, he did not inform Segura that he also spoke Spanish. After speaking with Segura for a few moments, Detective Gonzalez determined that Segura "did not need a translator per se." Although Segura was slow to respond at times, he opined that Segura understood everything that was said to him.

Eventually, Detective Gonzalez spoke in Spanish to Segura and determined that Segura was from Panama. Detective Gonzalez asked Segura if he had a different dialect, and Segura said, "No." Detective Gonzalez explicitly asked Segura if Segura had any problems understanding Detective Gonzalez's Spanish, to which Segura replied, "No." Detective Gonzalez said he also understood Segura when Segura spoke in Spanish. Detective Gonzalez said he tried to keep the questions "fairly simple" and did not use any "big words." Detective Gonzalez said Segura spoke to him in English "seventy-five to eighty percent of the time." The detective explained his interaction with Segura:

> When I spoke to him, he pretty much responded in what we call Spanglish [sic]. A little bit of English, a little bit of Spanish. Whenever he had a tough time explaining something, he would revert back to Spanish and say what he was saying, wanting to say, in Spanish instead of English.

Detective Gonzalez said that at some points during questioning, Segura would "stop and ask [him], 'I don't understand what they mean. Can you explain to me?'" Detective Gonzalez said that he would explain or respond to Segura in Spanish, and Segura would then respond in English. Segura was advised of his Miranda rights each time the detectives began a conversation with him. Detective Gonzalez stated that Segura was advised of his Miranda rights in both English and Spanish. The Spanish version of the Miranda rights, which was provided to Detective Gonzalez through the police academy, was read to Segura "word for word."

Detective Gonzalez said he saw Segura sign two advice of rights forms prior to his interviews on May 29, 2006, and May 30, 2006. Each form was admitted into evidence during the hearing, along with the advice of rights section preceding two formal typewritten statements given by Segura. The advice of rights forms had the Miranda warnings in English on the front and in Spanish on the back.[1] Segura also placed his initials next to each of his rights, signifying that Segura understood them.

After the conclusion of the first formal written statement, Segura read it to himself in English, and Detective Gonzalez then read it aloud to Segura in Spanish. Segura made some corrections to the initial statement. For example, the statement included the word "interject," and Segura corrected it to read "inject" and placed his initials next to the correction. Segura also corrected three other typographical errors in the statement and placed his initials next to them. Segura also placed his initials on each of the seven pages of the formal typewritten statement. Detective Gonzalez was present during the interviews as well as the formal written statements given by Segura. Detective Gonzalez stated that at the time of these written statements, Segura appeared to understand his Miranda rights and declined to invoke any of these rights.

On cross-examination, Detective Gonzalez agreed that the word dialect was "difficult" and that he had to explain it to Segura during their discussion. Detective Gonzalez explained that he was a certified instructor for the police academy who had taught "survival Spanish" for the police academy. However, he agreed that he had no specialized training in translation and was not court certified. Detective Gonzalez acknowledged that the formal written statements did not reflect the particular times that Segura needed assistance with translation. Detective Gonzalez further acknowledged that Segura had been interviewed prior to the detective's arrival at the bureau. He was unsure of the amount of time that Segura had been in custody prior to his interaction with him. He agreed that Segura was interviewed "all day" and that the first interview ended at 1:00 or 2:00 a.m. Detective Gonzalez said that he did not advise Segura of his rights under the Vienna Convention because he was unfamiliar with the law.

On re-direct examination, Detective Gonzalez said that Segura was healthier at the hearing than he was when he was interviewed. He explained that Segura was "skin and bones" during the interview and appeared to be living a "rough life." Detective Gonzalez acknowledged that Segura was "tired" and "not all there" on the first day. However, the next day Segura "seemed more apt to speaking with [the officers]." On re-cross examination, Detective Gonzalez said that it was "hard to say" whether Segura was under the influence

---

[1] The transcript reflects that the witness read the entire form in Spanish at the hearing. The testimony was not transcribed in Spanish.

of alcohol or drugs on the first day but that Segura seemed "squared away" on the second day.

Detective Chris Harris of the Shelby County Sheriff's Department testified that he participated in the investigation of the victim's death. He arrived at the homicide bureau the morning of May 29, 2006, and was advised that Segura had "already signed the Rights Waiver form." Detective Harris observed the signed advice of rights form and began talking to Segura in English. He spoke to Segura in English for the next two days and "felt comfortable with the fact that [Segura] could speak English[.]" Detective Harris said that Detective Gonzalez was present during his discussion with Segura to "clear up" any language problems.

Detective Harris personally advised Segura of his <u>Miranda</u> rights prior to speaking with him the next day, May 30, 2006. Detective Harris said the majority of the interview was "one[-]on[-]one [in] English between [Segura and Harris]." Detective Harris then corroborated the testimony of Detective Gonzalez with regard to the process by which Segura was interviewed. He said that Segura never indicated that there were any kind of cultural differences that precluded Segura from understanding what was happening during the interview process.

Detective Harris explained that Segura's statements were typed but were not recorded because that was the policy of the Memphis Police Department. He also said that it would have been difficult "to make heads or tails of [a recording]" because it would have contained statements in both Spanish and English.

Segura testified that he did not understand any of the rights in the advice of rights form. He signed the advice of rights forms because he "had promised [the officers] [he] would give them cooperation." On cross-examination, Segura said that he understood Detective Gonzalez's statements to him. However, he insisted that he was not advised he would be arrested when he initially agreed to go to the police bureau. Segura said when he rode to the bureau with the officer, he was not told that the victim was dead. Segura was confused when his rights were initially explained to him, and he thought he was "getting ahead of his court date" because of fighting with the victim.

Rachel Morin testified that she had known Segura for three or four years prior to the victim's death and considered Segura a friend. Morin testified that Segura spoke "broken English, but enough to where we could understand each other. I mean, he would ask us, 'How do you say,' you know, because we didn't speak Spanish." She said that neither she nor the victim spoke Spanish. Morin said she never needed an interpreter to communicate with Segura, and he appeared to understand her.

On October 16, 2008, the trial court orally denied the motion to suppress. Segura proceeded to trial.

**Trial.** Amanda Darby, the victim's daughter, testified that the last time she saw her father alive was the day before he was killed. She was notified by the police on May 28, 2006, that a body, believed to be her father, had been found. Her father was forty-eight years old and in good health at the time of his death. She said her father had a small build and was 5'8" tall. She identified a photograph taken of her father in 1997 or 1998, which fairly and accurately depicted her father's size at the time he was killed.

On cross-examination, Darby agreed that her father "did odd jobs" for employment. She said that he did mechanic work, but was not employed with a company. Her father lived with her family and was good with her children. At times, she suspected that her father had a drug problem, but it did not affect her family. Darby agreed that her father had a "whole different life[.]" Although Darby denied that her father was "macho[,]" she said her father "had a lot of pride . . . and if he felt he was right about something, he made it clear that he was right." She said she never knew her father to be violent.

Rachel Morin, a friend and former co-worker of the victim, testified that she had known the victim for ten years. She said that she had been introduced to Segura by the victim and that she considered Segura a friend. Segura was always with the victim and used to work with him. Morin said she was with the victim and Segura on May 26, 2006. She had also seen Segura the day before but had not seen him in over a year and a half prior to that day. Morin said the victim and Segura came to her home around 10:00 or 11:00 a.m. the day of the offense. At the time, Morin was with some friends, including Angie Joyner.

Morin, Joyner, the victim, and Segura went to the Loosahatchie River to swim that day. Morin testified that the victim and Segura drove to her home in the victim's "little white car." Morin said that she and her friends had been partying, smoking crack, and drinking. She left her home around 12:00 or 1:00 p.m. with the victim, Segura, and Joyner. They drove to the sandbar, and all four of them began smoking crack and drinking alcohol. They swam in the river until 6:00 p.m.

As they were leaving, the victim's car got stuck in a mud hole on the second tier of the levy. Although Morin, Joyner, and the victim thought that getting the car stuck was funny, Segura was "upset because he had to go pick up some money[.]" She and the victim attempted to free the car by "shoving a four by eight [board] under the tires[.]" The victim helped by "leverag[ing]" the vehicle. She said that Segura was only "halfway" helping because he was "real[ly] mad."

Morin described the victim as a small, slim man. She said Segura "towered" over the victim. When an unknown person began shooting a gun nearby, Morin called a friend to pick her up. Morin and Joyner left with Morin's friend around 6:30 p.m. As they left, the victim and Segura were still trying to free the car from the mud. Although she did not see the victim or Segura with any weapons, she knew that Segura was still very angry. She never spoke with the victim again after that night. After hearing on the news that a body had been found next to the white car, Morin telephoned Segura, but Segura hung up on her.

Morin said that she did not speak Spanish and that Segura spoke to her in English. She explained that Segura spoke "broken English," but "he could understand her[,] and she could understand him just fine." She said that neither the victim nor Joyner spoke Spanish.

On cross-examination, Morin confirmed that although she had been subpoenaed to testify in court the prior day, she failed to appear. She said she worked for a demolition company based in Omaha, Nebraska with the victim. Morin said she was "very close" with the victim and acknowledged that she and the victim had done drugs, shot pool, and gone horseback riding together in the past. Morin said that she, Joyner, the victim, and Segura shared nine rocks of cocaine and smoked "about the same amount" of crack the day of the offense. Morin acknowledged that nine rocks of cocaine was a large amount.

Brandon Stroud testified that he was riding four-wheelers in the area of Memphis known as "Frayser bottoms" near the Loosahatchie River on May 27, 2006. Stroud did not know the victim or Segura. On that date, Stroud saw a car parked on the trail that he had never seen before. The car was blocking the path, and Stroud went over to investigate. He then walked around the left side of the car and observed a "body l[ying] there in front of the car in a rut." He said that it was a "little bit" wet and muddy in the area. He described the condition of the body he found: "[There] was . . . a rut about three f[ee]t wide[,] and [the body] was just l[ying] inside the rut with blood . . . pouring out of his head." Stroud's girlfriend's father called the police. Stroud believed that the car had been stuck in the mud because "one side was slanted[,] and it looked like it [had been] dug out."

Officer Jeffrey Kemp, assigned to uniform patrol with the Shelby County Sheriff's Department, testified that he responded to the location where the victim's body was found. Upon arrival, he spoke with Stroud, who led him to the body. He then secured the scene. On cross-examination, Officer Kemp said he did conduct a search based on the license plates on the car.

Sergeant Vernon Dollahite, Jr., who was assigned to the homicide division of the Shelby County Sheriff's department the day the victim's body was found, testified that he completed a diagram of the body's location and a drawing depicting the body's location in

relation to the car, which were both admitted as exhibits at trial. Sergeant Dollahite also took photographs of the crime scene, the victim's body, and the car, which were also admitted into evidence.

Officer James Bishof of the Shelby County Sheriff's Office testified that he was the case coordinator regarding this crime. He said he supervised the process by which the evidence was collected from the crime scene and transported various items of evidence, including the victim's prints and blood, from the forensics center to the Tennessee Bureau of Investigation (TBI). Officer Bishof did not collect the items, but was responsible for placing them in the evidence envelope. He sealed the bag containing the front of the wheel that had "possible blood" on it. He also identified other envelopes of evidence taken from the crime scene, including a vehicle jack and a scissor jack, both of which were admitted as evidence at trial.

Detective Kevin Helms, who was assigned to the Drug Enforcement Administration task force of the Shelby County Sheriff's Department, testified that he helped locate individuals who were "involved [with] or knew [the victim]." Detective Helms was aware that the victim had recently purchased drugs from a location that was under surveillance. He also determined through interviews with witnesses that the last person seen with the victim was an individual whose first name was "Jose." After obtaining this individual's address, he was able to speak with Josue Segura. Detective Helms said that Segura "spoke English[,] and he identified himself as Jos[u]e Segura." Segura told Detective Helms that he knew the victim. During this conversation, Detective Helms and another officer were standing in Segura's front yard, outside his trailer. Detective Helms said that Segura was not in custody at that time. He detailed his conversation with Segura:

> We spoke, and I asked [Segura] if he knew [the victim], and he said, yes, he did know him. That he hadn't seen him. And then I asked him the last time he saw him. He said . . . the last time he saw him was on Wednesday. I believe it was [May] 24th [sic]. And that [was] basically [our] conversation. At that time, I asked him if he would come downtown because we wanted [to ask] some further questions, just to talk to him, and [obtained] a consent [to search Segura's property]. We asked [Segura] if there was any property of [the victim's] there, and he said, no. [Segura] and his mother both signed a consent form [for the search of their property]. And they both signed it, [and we] went in. I think we located maybe some clothes with some mud on [them]. And at that time, . . . I asked [Segura] if he would come downtown. He was not under arrest[.] He volunteered [to come] downtown. He actually rode with me in [my] vehicle. He wasn't placed in handcuffs[,] and we went down to 201 Poplar [to] the ninth floor where our detective bureau is [located].

Detective Helms said that at that point, Segura was not a suspect. However, he said that Segura was the last person "we knew who had spoken with [the victim]." Upon their arrival at the bureau, Detective Helms spoke with Segura in a wide open space on the outside of the cubicles in the office rather than in an interview room. He told Segura that he was not under arrest and that he was free to go. Segura was not placed in handcuffs and was told where the restrooms were located.

Detective Helms said that Segura told him the last time he saw the victim was "Friday[.]" Segura said that he and the victim were "with two girls; that he didn't know [who they were], and that they were down in the bottoms . . . down there swimming." When they heard gunshots, "the two girls . . . left[.]" Detective Helms said that at that point, Segura began "acting different[ly]" and became "fidgety[.]" He also said Segura's answers were "incoherent at times[,]" and Segura began "mumbl[ing] or speak[ing] Spanish." He said Segura "appeared very uncomfortable." Detective Helms asked Segura if he was involved in the victim's death, and Segura immediately responded, "I didn't kill anybody. And we weren't fighting." Detective Helms said that Segura was speaking in English and Spanish. Detective Helms asked Segura if he needed an interpreter, and Segura replied, "[Y]es." Segura also was allowed to use the restroom and was given a "Coke" to drink.

Detective Helms said that he did not speak Spanish and that Segura was speaking mainly in English, not Spanish, before he requested an interpreter. Detective Helms said that he understood Segura and that Segura seemed to understand him. Detective Helms did not ask Segura any other questions until an interpreter was present.

Lieutenant John Mills of the Shelby County Sheriff's Department testified that he spoke with Segura and handled certain evidence involved in this case. Lieutenant Mills ensured that the evidence was sealed and delivered to the TBI. He also talked with Segura regarding his constitutional rights. Lieutenant Mills said he spoke to Segura in English. He said he spoke with Segura "quite often[,] and [Segura] understood [Lieutenant Mills,] and [Lieutenant Mills] understood [Segura]."

Lieutenant Mills read an advice of rights form, which was in English and Spanish, to Segura. The form advised Segura of his Miranda rights. Lieutenant Mills said that Segura teased him because Lieutenant Mills could only read the English part of the form, while Segura could read the Spanish and English parts of the form. He said Segura read the English part of the form aloud to Lieutenant Mills. Lieutenant Mills said that Segura appeared to understand the form and that Segura did not appear impaired. Lieutenant Mills said that he did not threaten or force Segura to sign the form. Segura was given a cigarette and a drink of water during the interview.

On cross-examination, Lieutenant Mills explained that Segura spoke "good English" with an accent. As a supervisor of the homicide unit, Lieutenant Mills's main concern was that Segura understood him and vice versa. Lieutenant Mills "wanted to make really sure" that Segura understood what was happening. He said that he had a translator that could have been used, but the translator was not needed.

Dr. Marco Ross, a forensic pathologist and deputy medical examiner for Shelby County, testified that the chief medical examiner performed the autopsy of the victim in this case. He said that the autopsy report showed that the victim suffered from multiple "lacerations or cuts of the scalp and forehead as well as multiple skull fractures and hemorrhage within the skull on the surface of the brain, as well as bruises of the brain tissue itself." The victim's cause of death was "multiple blunt force injuries to the head[,]" and the manner of death was homicide. The victim received a minimum of eight impacts to the head.

Dr. Ross said that the autopsy photographs showed most of the victim's face and the lacerations to the victim's forehead. He said that although a number of objects could have caused the fatal blows in this case, the pipe and the jack, both admitted as exhibits at trial, were consistent with objects that could have inflicted the blows to the victim's head. Dr. Ross used the autopsy photographs to facilitate his testimony regarding the victim's injuries. The victim was five foot, five and a half inches tall and weighed one hundred and fifteen pounds at the time of his death. The victim had cocaine and cocaine metabolite or breakdown product in his blood and in his urine. Dr. Ross noted that the victim had some wounds on the inside of his hands but did not observe any injuries consistent with defensive wounds on the victim.

Agent Charles Hardy of the TBI serology and DNA unit testified that most of the evidence submitted in this case tested negative for DNA or blood. Although his examination of the three samples taken from the car showed the presence of blood, no DNA profile was obtained because there was insufficient or degraded DNA. The sample taken from the top of the car revealed a partial DNA profile consistent with the victim's DNA. Agent Kendra Fleenor of the latent prints division of the TBI testified that none of the evidence submitted contained identifiable latent prints.

Detective Milton Gonzalez of the Memphis Police Department testified that on May 30, 2006, he received a phone call from a lieutenant in the General Assignment Bureau (GAB) requesting his assistance. Detective Gonzalez said the lieutenant was aware that he was a native Spanish speaker. Detective Gonzalez said that there were several different dialects in the Spanish language and that "Mexicans speak a different dialect or a different form of Spanish than Salvadorans, Guatemalans." He said, "[I]t's like . . . a New Yorker

speaking English and somebody from the south speaking English. Some of the words are lost in translation. Some words mean different things."

Detective Gonzalez arrived at GAB at 8:00 p.m., and Segura was sitting in the break area drinking a Coke and eating. He sat down and began to talk to Segura in Spanish. He introduced himself, told him why he was there, and asked if it was okay if they talked. Detective Gonzalez asked Segura if he understood Gonzalez's Spanish, and Segura said he did. Based on Segura's dialect, Detective Gonzalez believed Segura was from Panama or South America. Later in the conversation, Segura told him he was from Panama. Detective Gonzalez determined that Segura spoke "Castellano" or "Castilian" Spanish, which he described as "regular" or "schoolbook" Spanish. Detective Gonzalez testified that "some of the words [were] different, but not very many, and if there was a problem, [they] work[ed] it out."

Detective Gonzalez testified that he understood Segura's Spanish, and Segura understood his Spanish. Detective Gonzalez said that "most of the conversation" between Segura and Detective Chris Harris was conducted in English. Detective Gonzalez said that "every now and again" Seguro would ask a question, and sometimes Segura said, "[H]ow do I say this in English?" Detective Gonzalez testified that he would clarify or answer Segura's question. Detective Gonzalez said that Segura appeared to understand English. Although Segura told him how long he had been in this country, he could not recall his answer.

Detective Gonzalez said that Detective Harris advised Segura of his <u>Miranda</u> rights prior to the interview. He characterized the interview as "friendly":

[Segura] began telling the story that he met the victim. They picked up two females. Went to a wooded area to go swimming. While they were there they proceeded to engage in some drug use. And at some point they decided to leave. The vehicle got stuck. The females left. And there was an altercation between him and the victim. And at some point a lead pipe was used to strike the victim several times in the head.

Detective Gonzalez said that Segura provided the above information to them in English. He identified an advice of rights form which was read to Segura in English and Spanish. The front page of the form advised Segura of his constitutional rights in English, and the back of the form advised him of the same in Spanish. Segura read the form and then signed and dated it in the presence of Detectives Gonzalez and Harris.

Detective Gonzalez said the interview concluded sometime after midnight. Segura told the detectives that he was tired, and they allowed him to "go back downstairs." The

officers told Segura that they had more questions for him and asked to speak with him the next day, to which Segura consented. Detective Gonzalez said that Segura was coherent, "fairly calm," and "wanted to know what we knew."

Detective Gonzalez spoke with Segura the next day from midmorning to 7:00 or 8:00 p.m. He said he wanted to question Segura about some new evidence they had received. After describing how the victim had been beaten, Segura became very emotional. Detective Gonzalez said that "once [Segura] told us that he struck [the victim] with the pipe and left, [he was relieved], it was almost like he got it off his chest, and he was okay." Detective Gonzalez did not recall observing any injuries, bruising, or scars on Segura. He said that Segura mentioned "something" about receiving some injuries but no injuries were apparent.

After the interviews, Detectives Gonzalez and Harris obtained two formal written statements from Segura. Segura was advised of his <u>Miranda</u> rights prior to giving these written statements. The first statement was obtained at 1:00 p.m. and consisted of seven typed pages, which were signed and dated by Segura. Detective Gonzalez said that "a couple of times" Segura asked for clarification of a word. Segura would ask Detective Gonzalez in Spanish, "How do you say this word in English?" Detective Gonzalez said that he always helped Segura find the word he was trying to express in English and that Segura had no other difficulties giving his statement.

After Segura told the detectives that he had gone to the river with the two girls and the victim, he detailed the group's activities at the river. Segura also detailed his physical altercation with the victim:

Question: What happened when [the victim] gets the [pieces of] wood?

Answer: His car has a little problem. His car doesn't have a clutch. He doesn't think I can drive it with no clutch. We have to crank the car[,] and it starts to run. It runs . . . [, and I] can drive it with no clutch [sic]. We had to crank the car[,] and it starts to run. It runs rough, but then it starts. I do this, and I miss one time, and [the victim] gets p[-----] off. He says you don't know how to f[------] drive my car. He was p[-----] off many times. I tried to calm him down. I said to him, let's do it your way. I shut the car off[,] and he tells me to start pushing the car. He gets back in the driver's side. He wanted me to push the car to the front. I say [to the victim], we are . . . closer to the back. I wanted to go backwards. He wanted us to go forward. I'm tired. We are disagreeing about how to push the car. He told me to keep pushing [because] we are almost to the dry spot. [The victim] was very mad at me. I am pushing [the car] by myself. [The victim] is treating me like I'm a slave. I'm scared

-11-

because I'm thinking [sic] he wants to kill me. Because he is so mad. I can't take no more [sic]. [The victim] says to me you are not going to push this car. He starts to yell at me again. I'm in the driver's seat. [The victim] is outside the car. [The victim] tires (sic) to hit me while I'm sitting in the driver's side. He tries to hit me a few time. He isn't able to hit me. I'm thinking he is going to hurt me[,] and . . . he tries to hit me.

Question: What was [the victim] trying to hit you with [sic]?

Answer: With a closed fist.

Question: How many times did [the victim] try to hit you?

Answer: Four or five times with both fists. He lost control, [and] he started to try to beat me. I said, stop. And he finally stopped. He was still calling me a m[-----] f[-----]. I saw the jack, but I stopped and did not hit him. I said, no, I'm going to try to get out of this situation. He doesn't ask me for the jack. I had the jack in my right hand. I got out of the driver's seat. I'm going to give him the jack. But he swung at me. And I swung back. I swung back. I swung the jack behind me. I hit him behind the head[,] and then he fell into the wheel. I ran away.

Question: Describe what the jack looks like that you hit [the victim] in the head with [sic]?

Answer: I believe it was a black jack, like a scissor jack. You would have to use a wrench to turn it.

Question: When you hit [the victim] in the head with the jack, which tire did he fall beside?

Answer: He fall [sic] on the driver's front side.

Question: When he fell, what did you do?

Answer: I really don't know. I ran. I didn't stop.

Question: Did you know that he was dead? Did you think he was unconscious?

Answer: I think [sic] he was just knocked out.

After the statement was typed, Segura read it, made several corrections, which were noted by his initials, and then he signed it. Detective Gonzalez read the final statement to Segura in English and Spanish.

The second statement, given by Segura later that same afternoon, was prompted after the detectives received additional information that the victim had been struck in the head several times. Segura was again advised of his constitutional rights. He indicated that he understood those rights by signing his initials and told the detectives that he wanted to provide a second statement. In the second statement, Segura admitted that he struck the victim a minimum of five times with a red pipe. Segura said that he struck the victim because "[the victim] continued to attack [him] and attempted to grab [his] foot" and because that was the only way he could get away from the victim. Segura said that the victim was not moving after the last time Segura struck him. When the detectives asked if he killed the victim, Segura replied, "Yes."

On cross-examination, Detective Gonzalez acknowledged that his contact with Segura occurred after Lieutenant Mills had spoken to Segura. He said Segura was not handcuffed during his interview and was free to roam around the room. Detective Gonzalez agreed that Segura said that he was defending himself in both of his written statements. He stated that Segura was very upset about the victim's death.

Detective Chris Harris testified and corroborated the testimony of Detective Gonzalez. Detective Harris was present during the interview and during each statement provided by Segura. Detective Harris said he asked Segura questions in English, which Segura appeared to understand.

The Defendant-Appellant testified on his own behalf.[2] Segura weighed 205 pounds during trial and 150 pounds at the time of the offense. In May 2006, Segura lived with his mother in a trailer park in Millington, Tennessee. He was born in Panama, had a ninth grade education, and came to the United States in 2000. When asked if he spoke English and Spanish, Segura replied, "Not correctly the English, but quite a bit." Segura said that he "forced" himself to speak better English because of the people to whom he became acquainted in the United States. He acknowledged that he spoke English well enough to communicate with others in English.

---

[2] Previous testimony indicated that Segura was wearing a headset during the trial. The record further shows that the following testimony was with the assistance of an interpreter.

Segura said he had known the victim for three months prior to the victim's death. On the day of the offense, Segura said that he and the victim went to Morin's house, where several other people, including Angie Joyner, were present. Segura said that he, the victim, Morin, and Joyner drank alcohol and used drugs before they decided to drive to the river. Once there, they continued to drink and use drugs. The victim and Rachel went swimming and had sex. Segura and Joyner continued to drink alcohol and use drugs. Eventually, Joyner allowed Segura to teach her to swim. Rachel called for Joyner to have sex with her in the car. Segura and the victim were sitting behind the car smoking crack. As the women engaged in sex, three African-American men approached the car. One of the men asked to join the women and insulted Segura and the victim.

The victim attempted to scare the men off and yelled, "You dirty Negroes, leave." Rachel was upset and wanted the men to leave. However, Rachel asked one of the men for a cigarette, and the man replied, "If you don't let me have sex with you, why are you going to ask me about cigarettes?" Segura said Rachel told the man "to go to h[---,]" and the man told her the same before walking down to the river to smoke marijuana. Segura said that Rachel wanted to leave because the men were watching them. The group moved closer to a "beach area" of the river, away from the men.

Approximately two to three hours later, Segura told the victim that he needed to leave to collect some money. Segura said he needed to pick up the money no later than 9:00 p.m. He pleaded with the victim to leave before it became dark; however, he insisted that he was not angry. The group left and took a different route than the one used to come to the river. Segura described the route as a muddy dirt road with several ponds. Segura told the victim that they would get stuck and that the road was unfamiliar, but the victim angrily replied that, "this was his territory and he knew his territory and his car." Segura said that they eventually got stuck and that everyone was "in disagreement" with the victim.

Segura said that the victim began to insult everyone in the car. When the women got out of the car to push it, they heard twenty-five to thirty gunshots. Segura and Joyner were seated in the back of the car and were "frightened." Rachel and the victim were shouting and insulting each other. The victim insisted that Segura get out of the car to push. Segura was quiet because he believed "someone was being killed." During this time, Rachel called her friend to give them a ride. When the gunshots stopped, Segura got out and started to push the car. Segura and the victim looked for items to put under the wheels of the car for traction. The victim also retrieved a scissor-type jack out of the trunk of the car.

Segura and the victim placed items under the wheels of the car and began to push it. During this time, Morin's friend appeared, and the women "took off running" to his car. Rachel told Segura to stay with the victim. When Segura tried to leave with the women

Rachel's friend got angry and refused to allow him into his car. Segura was told that they were going to send help for him and the victim.

By this time, it had gotten dark, and Segura went back to the victim's car for safety. As Segura returned to the car, the victim called him "a son of a b[----]," a "m[-----] f[-----]," and "a d[---] n[-----]."[3] The victim ordered Segura to push the car or he would not give Segura a ride to get his money. Segura said he had no choice but to help push the car. They attempted to push the car for another fifteen to twenty minutes, to no avail. Segura said that at one point, they argued over which direction to push the car. The victim verbally insulted Segura again, calling him the same derogatory names, including "you F[------] Panamanian." Finally, Segura refused to push anymore because he had a twisted ankle.

Segura then saw four people on two four-wheelers enter the area. He attempted unsuccessfully to get help from them. Segura said the victim began to insult him again. They rested in the car for a while, just listening to each other. The victim cleaned his pipe and smoked. Segura got out of the car and began pushing the car again. Segura pushed the car for fifteen minutes and nearly pushed the car out of the mud. Segura asked for a break so that he could drive the victim's car as the victim pushed, but the victim refused. Segura begged the victim to allow him to drive the car because he was tired of pushing it.

The victim relented and instructed Segura on how to drive the car. While the victim was outside pushing the car, Segura was unable to crank the car. Segura said the victim was "very sour, very bitter . . . very mad." The victim approached the driver's side window and began to insult Segura again. Segura said that he told the victim, "[S]ir, the last thing you need to do is to hit me as if I were your son." The victim responded by insulting him and swinging at him four or five times, striking him on the neck. Segura closed the window and locked the car door because he was afraid. He lowered the car window after approximately ten to fifteen minutes. The victim had calmed down and was no longer screaming insults at him.

Segura then got out of the car in an attempt to help the victim. As he was exiting the car, he saw a pipe on the floor of the passenger side of the car. Segura reached for the pipe, and the victim "took a blow at [Segura]." Segura avoided the victim's blow and then hit the victim with the pipe until the victim fell to the ground. Segura said that he was afraid of the victim because the victim had already attacked him twice. Segura believed he had no choice but to defend himself. Segura struck the victim six or seven times because the victim

---

[3]The transcript reflects that the interpreter initially used the word "Negro" in an effort not to be offensive. However, defense counsel requested clarification on the exact word used by Segura because defense counsel believed it affected Segura's state of mind.

-15-

grabbed his pants and would not let him go. After the victim ended up on the ground, Segura heard the victim "complaining." Segura did not believe the victim was dead. Segura ran away and did not return. Segura testified that he did not intend to kill the victim.

Segura said that he was contacted by the police a few days later. He explained that he was cooperative and that he was surprised when he saw the photo of the victim because he "never imagined that [he] would see [the victim] dead."

On cross-examination, Segura denied hitting the victim with a jack. He said that although he had told the police about the jack "in the beginning," he insisted that he did not hit the victim with a jack. When asked why he told this to the police, Segura said:

> I knew that I hadn't hit him with any jack. I wanted to throw them off the track, because when they went to look for prints, they wouldn't find any print of mine on the jack. I wasn't going to be responsible for any death that [I didn't cause] . . . I didn't kill anybody.

When Segura was asked if the victim's head got "bashed in" with the pipe he used, Segura said, "Ma'am, I can't tell you how . . . his head was crushed. I didn't hit him – I didn't hit him in that way, like the doctor, the medical man said, I didn't hit him with any jack." However, Segura acknowledged that he struck the victim with a pipe, similar to the lead pipe recovered from the scene, possibly seven times. He insisted that he did not hit the victim "hard enough" to kill him.

The jury convicted Segura of first degree premeditated murder. Segura was sentenced to life imprisonment. This appeal followed.

## **ANALYSIS**

Initially, we must first determine whether this Court should dismiss the appeal because Segura failed to timely file his notice of appeal. The State argues the notice of appeal was untimely by one day. Segura does not provide a response. Tennessee Rule of Appellate Procedure 4(a) states that "the notice of appeal required by Rule 3 shall be filed with and received by the clerk of the trial court within 30 days after the date of entry of the judgment appealed from . . . ." However, this rule also states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. App. P. 4(a). This court, in deciding whether to grant a waiver regarding an untimely notice of appeal, "shall consider the nature of the issues for review, the reasons for the delay in seeking relief, and other relevant factors presented in each case." Michelle Pierre Hill v. State, No. 01C01-9506-CC-00175, 1996 WL 63950, at *1 (Tenn.

Crim. App., at Nashville, Feb. 13, 1996), perm. app. denied (Tenn. May 28, 1996). "Waiver is not automatic and should only occur when 'the interest of justice' mandates waiver. If this court were to summarily grant a waiver whenever confronted with untimely notices, the thirty-day requirement of Tennessee Rule of Appellate Procedure 4(a) would be rendered a legal fiction." State v. Rockwell, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007) (citing Michelle Pierre Hill, 1996 WL 63950, at *1).

In this case, Segura was convicted of first degree premeditated murder on June 26, 2009. He was sentenced to life imprisonment on July 30, 2009, but the judgment form was not entered until March 24, 2010.[4] Segura then filed his notice of appeal on April 24, 2010. Given that the notice of appeal was untimely by only one day, we conclude that the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998).

**I. Motion to Suppress**. Segura argues that the trial court erred in denying his motion to suppress. In his brief, Segura makes several sweeping claims challenging various aspects of the process by which authorities obtained his statements. He claims that his statements were involuntary because (1) he is "functionally illiterate . . . with only a rudimentary understanding of English," (2) he "thought he was bound by a promise" given to authorities that he would cooperate, (3) the State failed to show that "no relevant cultural differences existed at the time the Miranda warnings were obtained," (4) he was not informed of his right to speak with Panamanian counsel under the Vienna Convention; (5) the Miranda warnings given in Spanish in the advice of rights form were insufficient; and (6) no "independent neutral interpreter" was present at the time he gave his statements or reviewed the accuracy of his statements. The State provides a general response, contending that the trial court properly determined that Segura executed a voluntary and intelligent waiver of his rights prior to making his statements to authorities.

First, we are compelled to note that Segura failed to raise the issue regarding the denial of his motion to suppress in his motion for new trial, as required by Tennessee Rule of Appellate Procedure 3(e). Neither party has addressed this issue. Rule 3(e) provides, in pertinent part:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new

---

[4]The record does not explain the lengthy delay in entering the judgment form.

> trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

Tenn. R. App. P. 3(e). Accordingly, we are precluded from reviewing this issue unless it rises to the level of plain error. See State v. Frederick Darnell Alexander, No. M2011-00591-CCA-R3-CD, 2012 WL 829663, at *2-3 (Tenn. Crim. App., at Nashville, Mar. 12, 2012), perm. app. denied (Tenn. May 21, 2012).

In State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), this court stated that in order for an error to be considered plain: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000). Furthermore, "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." Similarly, the Tennessee Constitution states "that in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986).

A police officer is required to warn a suspect of his Miranda rights prior to a custodial interrogation. See Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); State v. Riels, 216 S.W.3d 737, 754 (Tenn. 2007). The Tennessee Supreme Court has stated, "The warnings and waiver mandated by Miranda 'are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant' during custodial interrogation, whether inculpatory or exculpatory." State v. Northern, 262 S.W.3d 741, 749 (Tenn. 2008) (quoting Miranda, 384 U.S. at 476). Any waiver of Miranda rights must be "made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. A court must look to the totality of the circumstances in determining whether a defendant has validly waived his Miranda rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992) (citing Oregon v. Elstad, 470 U.S. 298, 318, 105 S. Ct. 1285, 1298, 84 L. Ed.2d 222

-18-

(1985); State v. Kelly, 603 S.W.2d 726, 728-29 (Tenn. 1980)), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 306 (Tenn. 2002).

The standard of review applicable to suppression issues involves a mixed question of law and fact. State v. Garcia, 123 S.W.3d 335, 342 (Tenn. 2003). "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Cox, 171 S.W.3d 174, 178 (Tenn. 2005) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard in State v. Odom:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. The Tennessee Supreme Court has concluded that "a trial court's determination at a suppression hearing is presumptively correct on appeal." State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003) (citing State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986)).

We have undergone an exhaustive review of the record and conclude that it does not demonstrate plain error. None of Segura's claims are supported by the record.

Segura's claim that he is functionally illiterate is refuted by the testimony of Rachel Morin and Detectives Gonzalez and Harris. Morin stated that she had known Segura for three or four years. During that time, Segura spoke broken English, and Morin understood him without the necessity of a translator. The record shows that Detective Gonzalez read Segura his constitutional rights, in English and Spanish, no less than four times. Moreover, the record demonstrates that at the time of the statements Segura was forty-one years of age, had attended the ninth grade, and had been in the United States for six years. Despite Segura's testimony that he did not understand his rights, the trial court accredited the testimony of Detective Gonzalez and determined that Segura "did not indicate any lack of understanding" during the interview. Nothing in the record preponderates against this conclusion.

Segura also argues that his statements were involuntary because "he was bound by a promise" given to authorities that he would cooperate. Segura apparently contends that his promise to cooperate was a "cultural barrier" which prevented him from knowingly and

intelligently waiving his <u>Miranda</u> rights. However, Segura does not identify the circumstances at issue or the specific officer with whom he felt an obligation to cooperate. Detective Helms was the first officer with whom Segura had contact and testified that Segura was not in custody and voluntarily accompanied him to the homicide bureau. Once there, Segura blurted out in English that he did not fight or kill the victim and requested the assistance of an interpreter. Segura was not questioned any further without an interpreter. Thereafter, Segura was advised of his <u>Miranda</u> rights in English and was provided the written version of his <u>Miranda</u> rights in Spanish by Lieutenant Mills. Segura teased Lieutenant Mills because Lieutenant Mills was only able to read the form in English while Segura could read the form in Spanish and English. Lieutenant Mills said that Segura understood him, and he understood Segura. Lieutenant Mills also said that he requested the interpreter's presence out of an abundance of caution. Prior to each of the subsequent interviews and statements, Segura was advised of his rights, in English and Spanish, and declined to invoke them. On this record, we are unable to conclude that any cultural barrier existed that rendered Segura's statements involuntary.

Next, Segura argues that his statements were involuntary because he was not informed of his right to speak with Panamanian counsel under the Vienna Convention. He claims he would have more effectively understood his rights had this been done. Segura fails to cite any portion of the Vienna Convention and provides no supporting authority for this issue. Consequently, he has waived this issue. <u>See</u> Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (providing that a brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on"). Waiver notwithstanding, the United States Court of Appeals for the Sixth Circuit has held that "although some judicial remedies may exist, there is no right in a criminal prosecution to have evidence excluded or an indictment dismissed due to a violation of Article 36 [of the Vienna Convention]." <u>United States v. Page</u>, 232 F.3d 536, 540 (6th Cir. 2000); <u>Thompson v. State</u>, 134 S.W.3d 168, 174 (Tenn. 2004) (citing <u>United States v. Emuegbunam</u>, 268 F.3d 377, 389-92 (6th Cir. 2001)) (stating that the Vienna Convention, and particularly Article 36, does not create in a detained foreign national a right of consular access). Segura is not entitled to relief on this issue.

Segura next argues that his statements were involuntary because the <u>Miranda</u> warnings given in Spanish within the advice of rights form were insufficient. Here, he challenges the adequacy of the content of the Spanish <u>Miranda</u> rights form. He states that the Spanish portion of the advice of rights form contained a sentence following the <u>Miranda</u> rights that read, when translated, as the following: "With this in mind, do you want to make a statement

and answer questions with the total truth in your best judgment?" Detective Gonzalez provided the only proof regarding the translation of the Spanish portion of the Miranda rights form. Although Detective Gonzalez read the form in Spanish during the suppression hearing, there was no other translation of the Spanish portion of the Miranda warnings at the suppression hearing or at trial. Detective Gonzalez said that the back of the advice of rights form represented the Miranda rights in Spanish. Detective Gonzalez used a "go-by" or a standard form provided to him by the police academy to ensure he correctly read and translated the Miranda warnings to Segura. Ultimately, the trial court accredited the testimony of Detective Gonzalez. Accordingly, we are unable to determine, and Segura fails to explain, how this particular sentence rendered his statements involuntary.

Finally, citing State v. Jenkins, 81 S.W.3d 252 (Tenn. Crim. App. 2002), Segura argues that he was entitled to an independent certified interpreter before the officers interviewed him and during his interviews. In Jenkins, law enforcement responded to a fire at the home of a hearing-impaired victim. Id. at 255. Upon arrival, the investigators found a small crowd of people, including several hearing-impaired men assembled at the scene. Id. Investigators "partially communicated with these men by talking slowly, and by use of a 'makeshift' interpreter, a friend of the men who knew some sign language." Id. Officers later determined that they needed a better method of communication and asked some of the men, including the defendant, to meet them at the police station. Id. Subsequently, the defendant, after being advised of his Miranda warnings through an American Sign Language (ASL) certified interpreter, provided a statement admitting that he was at the victim's home and had thrown his lit cigarette into a pile of trash on the front porch. Id. The defendant saw smoke coming from the trash pile as he was leaving, but thought the fire would go out. Id.

At Jenkins's suppression hearing, the ASL certified interpreter testified that she had interpreted the Miranda warning less than ten times in the past and did not yet feel prepared to take the examination required in order for her to receive her specialist certification in legal interpreting. Id. at 258. Additionally, the Miranda warnings provided to the defendant prior to his statement were not recorded. Id. However, another sign language expert reviewed a "back translation" of the Miranda warnings performed by the ASL interpreter at a later preliminary hearing. Id. at 259. Based on the "back translation," the sign language expert determined that the ASL interpreter omitted several key concepts from the Miranda warning, including the right to remain silent and the right to counsel. Id.

Jenkins argued at his suppression hearing that his statement should be suppressed because it was taken without adequate Miranda warnings, thereby violating his Fifth Amendment right to counsel. Id. at 254-55. Contrary to Segura's contention, the issue in Jenkins was not whether he was entitled to a certified interpreter prior to being questioned by law enforcement. Rather, the issue was whether Jenkin's statement was involuntary

-21-

because the interpreter's translation of the <u>Miranda</u> warnings, based on the proof, was inadequate. <u>Id.</u> at 268. <u>Jenkins</u> does not provide support for Segura's claim that he was entitled to an independent certified interpreter before the officers interviewed him and during his interviews.

Segura also cites to a portion of the Commentary to Tennessee Supreme Court Rule 42 in support of his contention that an "unbiased certified interpreter" must be present during a police interrogation. Generally, Rule 42 provides guidance to the courts as to whether an interpreter is necessary during a judicial proceeding. Segura concedes that a police interrogation is not a judicial proceeding. Accordingly, he is not entitled to relief on this issue.

In light of the above analysis, we conclude that no plain error exists because no clear and unequivocal rule of law was breached. Consequently, Segura is not to entitled to relief.

**II. Denial of Second Motion for Mental Health Evaluation.** Segura argues that the trial court erred in denying his motion for a second mental health evaluation after the completion of the trial. The State responds that Segura offered no evidence establishing his need for a second mental evaluation.

"The test for determining if a defendant is competent to stand trial is whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him." <u>State v. Johnson</u>, 673 S.W.2d 877, 880 (Tenn. Crim. App. 1984) (citing <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960)). When the accused is believed to be incompetent to stand trial, the criminal, circuit, or general sessions court judge may, upon his or her own motion or upon petition by the district attorney general or defense counsel and after a hearing, order the defendant to undergo a mental evaluation. T.C.A. § 33-7-301(a)(1). "Before a mental evaluation is required, the evidence must be such as to warrant a belief that the defendant is incompetent to stand trial, or it must be sufficient to raise a question as to his mental capacity at the time of the crime." <u>State v. West</u>, 728 S.W.2d 32, 34 (Tenn. Crim. App. 1986). The decision to grant an evaluation is within the power of the trial judge, and this Court will not reverse a denial of a mental evaluation absent a clear showing of abuse of discretion on the part of the trial judge. <u>State v. Rhoden</u>, 739 S.W.2d 6, 16 (Tenn. Crim. App. 1987); <u>State v. Lane</u>, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984).

At the motion for new trial hearing, defense counsel argued that although the first mental evaluation determined that Segura was competent to stand trial, it "not[ed] . . . there

were some language issues[.]"[5] He further argued that Segura's language issues "diminished capacity on [Segura's] part." Counsel explained that Segura "insists on speaking English with his attorney even when the interpreter is present . . . It's not entirely intelligent." Counsel then opined that Segura's trial counsel[6] was unable to communicate to Segura the consequences of trying his case. Other than these comments by counsel, nothing further was offered in support of Segura's claim that the trial court erred in denying his request for a second mental evaluation after his trial was completed.

The trial court, at the motion for new trial hearing, responded:

I've ruled on [the language issue on] several other occasions. This court believes that Mr. Segura does not need an interpreter. We've used interpreters on several occasions out of an abundance of caution only. . . . Maybe [Segura] tries to hide behind the language.

We had motion to suppress[,] and that was one of the issues. The officers had an officer there who spoke Spanish out of an abundance of caution. Mr. Segura spoke and communicated with them in English. The warnings that were given to him were given to him in English as well as in Spanish, again, out of an abundance of caution.

At [times,] Mr. Segura has refused the use of the interpreter. I've ruled on a number of occasions, and I'll rule again that [Segura's evidence of a] language barrier . . . is nonexistent. He could communicate with his lawyers. He did communicate with his lawyers. He's communicated with this [c]ourt on many occasions.

So as far as there being any type of diminished capacity in relation to his impaired English use, . . . I'm ruling that is not the case.

As pointed out by the State, Segura put forth no evidence establishing a need for a second mental evaluation. Counsel's bald assertion that a second mental evaluation was needed is not evidence which "warrant[s] a belief that the defendant is incompetent to stand

_____

[5]On December 14, 2010, this court granted Segura's motion to supplement the record with "the order directing a forensic evaluation of the defendant" and "the letter from Dr. John Hutson, Ph.D., from the Midtown Mental Health Center that contained his findings on the Appellant's competency to stand trial." To date, no supplemental records have been submitted in this case.

[6]Counsel who argued the motion for new trial was appointed after the trial.

-23-

trial[.]" West, 728 S.W.2d at 34. Finding no abuse of discretion, we conclude that the trial court properly denied Segura's request for a second mental evaluation.

**III.    Photographs.**    Segura argues the trial court erred in admitting several photographs of the victim's dead body into evidence. The State argues that the issue is waived because Segura failed to timely object to the admission of the photographs at trial.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951 (Tenn. 1978)). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

In denying Segura a new trial on this issue, the trial court stated the following:

[W]e had [an] extensive hearing . . . prior to trial about the photographs to be introduced and [about] the photographs that were kept from the jury. [We can e]asily say that the photographs that were introduced had probative value, substantial probative value, given the issues that were faced.

I don't believe that there was any prejudicial effect. If there was any, it was substantially outweighed by the probative value of the photographs that were introduced[.]

In his appellate brief to this court, Segura asserts that a "pretrial motion requesting that the jury not to be shown photographs of the victim and his wounds" was filed. However, no such motion is in the record on appeal. Nonetheless, and contrary to the State's assertion, the record shows that defense counsel objected to these photographs prior to opening statements in this case and renewed his objection during trial. The trial court conducted a

full hearing to determine the admissibility of one photograph of the victim's body at the crime scene and four autopsy photographs showing the victim's head. During this hearing, defense counsel argued that the probative value of these photographs was outweighed by the prejudicial effect. He briefly asserted that the photographs were "gory" and cumulative of other witness testimony because the victim's cause of death was not contested.

Our review of the first photograph, exhibit five, shows the victim's body lying in a rut. The photograph shows the victim lying on his back, completely covered in mud, which prevented his wounds from being visible. The back of the victim's head, which is partially submerged in wet mud, is surrounded by a small pool of blood. We conclude that this photograph is not particularly horrifying or gruesome in nature and was properly admitted by the trial court. Compare Banks, 564 S.W.2d at 950-51 (citing People v. Jenko, 102 N.E.2d 783, 785 (Ill. 1951)) ("[P]hotographs of [a] corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character.").

In addition, there were six autopsy photographs admitted during the testimony of the medical examiner. The record shows that the State possessed 198 autopsy photographs in this case. It only sought to admit six autopsy photographs at trial. The court admitted two autopsy photographs because they related "directly to the State's theory that this was not self-defense[.]" The court reasoned that the remaining autopsy photographs were admissible because they depicted the victim's injuries and supplemented the medical examiner's testimony. Finally, the court determined that the autopsy photographs were "the cleanest photograph[s] of the [victim's] face[.]"

The first autopsy photograph in this case, exhibit 19, shows a "V"-shaped laceration of the victim's forehead. Although this photograph shows portions of the victim's crushed skull, there is no blood or internal brain matter shown in the photograph. The second photograph, exhibit 20, shows three lacerations on the top of the victim's head and a small amount of blood surrounding these lacerations. The third photograph, exhibit 21, shows small cuts near the victim's nose, on the bridge of the victim's nose, and his left eye as well as bruising and swelling; however, no blood is shown. The fourth photograph, exhibit 24, shows the back of the victim's head, which was partially shaved, and depicts two deep lacerations, one surface cut, and a large circular bump at the top of the back of the victim's head. The cuts are only slightly open, and they display a small amount of dried blood but no internal brain matter. The remaining two autopsy photographs showed the victim's torso and were not contested.

The record shows the deputy medical examiner utilized these photographs to supplement his testimony regarding the victim's injuries. See State v. Smith, 868 S.W.2d

561, 576 (Tenn. 1993) (concluding that the trial court did not abuse its discretion in allowing an autopsy photograph of the victim to illustrate the medical examiner's testimony). Segura testified that his altercation with the victim was minor and that he did not strike the victim "hard enough" to kill him. He claimed that the victim refused to let go of his leg, which prompted Segura to strike the victim again. Segura never conceded that he inflicted the injuries which caused the victim's death. Accordingly, the autopsy photographs depicted the degree of force used to strike the victim as well as the number of blows to the victim's head. See Wilson v. State, 574 S.W.2d 52, 56 (Tenn. Crim. App. 1978) (concluding that a photograph showing the victim's wound was admissible because it related to the defendant's self-defense theory and to the degree of the homicide). None of the photographs of the victim's fatal head injuries were particularly gruesome or horrific. Therefore, we conclude that the probative value of the photographs in this case was not substantially outweighed by the danger of unfair prejudice. Because the trial court did not abuse its discretion in admitting the photographs, Segura is not entitled to relief.

**IV. Sufficiency of Evidence.** Segura argues that the evidence was insufficient to support his conviction of first degree premeditated murder. In response, the State contends that there was more than sufficient evidence to sustain Segura's conviction.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. Odom, 928 S.W.2d at 23. When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of

illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). Premeditation also means:

> that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct[.]'" State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting Charles E. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)) (internal quotation marks omitted).

Segura provides only minimal argument regarding this issue and concedes that the evidence, when viewed in the light most favorable to the State, is sufficient to support his conviction. However, he argues that the State presented no evidence contradicting his theory that the victim was the first aggressor and that Segura acted in self-defense. The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Id. The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3) (2003); see State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

The record shows that Segura was involved in an altercation with the victim the night the victim was killed. Two days later, Segura admitted to police that he struck the victim in the head five times because the victim refused to release him. After hearing all of the facts and circumstances surrounding the killing, the jury, as was their prerogative, rejected Segura's theory of self-defense. As previously stated, it is not the function of this court to re-weigh or re-evaluate the proof presented at trial. Matthews, 805 S.W.2d at 779. We conclude, upon our review of the record, that a rational juror could have found that Segura

killed the victim, with premeditation, beyond a reasonable doubt. Accordingly, Segura is not entitled to relief.

_____

CAMILLE R. McMULLEN, JUDGE